No. 2023-2135

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION,

*Plaintiffs-Appellants*,

DATONG JUQIANG ACTIVATED CARBON CO., LTD., SHANXI INDUSTRY TECHNOLOGY TRADING CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD.,

*Plaintiffs*,

*v.*

UNITED STATES, CALGON CARBON CORPORATION, CABOT NORIT AMERICAS, INC.,

*Defendants-Appellees.*

On Appeal from the United States Court of International Trade,
No. 1:21-cv-00131-MAB, Chief Judge Mark A. Barnett

## BRIEF FOR PLAINTIFFS-APPELLANTS CARBON ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION

KANZANIRA THORINGTON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center,
250 Greenwich Street
New York, NY 10007
(212) 230-8800

DAVID J. ROSS
STEPHANIE E. HARTMANN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000

*Attorneys for Plaintiffs-Appellants
Carbon Activated Tianjin Co., Ltd.
and Carbon Activated Corporation*

November 6, 2023

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellants Carbon Activated Corporation and Carbon Activated Tianjin Co., Ltd. certifies the following:

**1.** **Represented Entities**. Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case.

Carbon Activated Corporation and Carbon Activated Tianjin Co., Ltd.

**2.** **Real Party in Interest**. Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

**3.** **Parent Corporations and Stockholders**. Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4.** **Legal Representatives**. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

GRUNFELD DESIDERIO LEBOWITZ SILVERMAN & KLESTADT, LLP:
Dharmendra Narain Choudhary, Jordan Charles Kahn, Brandon Michael Petelin, Francis J. Sailer, Elaine Fang Wang

**5.     Related Cases**.  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)     ☒ No     ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  Please do not duplicate information.  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6.     Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None.

Dated:  November 6, 2023

/s/ David J. Ross
DAVID J. ROSS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ..................................................................... v

STATEMENT OF RELATED CASES ...................................................... 1

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT OF ISSUES ON APPEAL ................................................. 2

STATEMENT OF THE CASE .................................................................. 2

I.      STATUTORY BACKGROUND .................................................... 3

II.     FACTUAL BACKGROUND ........................................................ 4

        A.      Background on Activated Carbon ........................... 4

        B.      Commerce's Administrative Review ...................... 6

        C.      CIT Decision in *Carbon Activated I* ..................... 8

        D.      Commerce's Remand Redetermination ................. 9

        E.      CIT Decision in *Carbon Activated II* ................. 11

SUMMARY OF THE ARGUMENT ....................................................... 12

ARGUMENT ......................................................................................... 13

I.      STANDARD OF REVIEW ......................................................... 13

II.     COMMERCE'S SELECTION OF SURROGATE VALUES FOR
        CARBONIZED MATERIALS IS UNSUPPORTED BY SUBSTANTIAL
        EVIDENCE AND SHOULD BE REVERSED ............................. 15

A.    Commerce Erred in Finding that there is a "Long, Demonstrable History" in this Proceeding of Respondents Using Coconut-Shell Charcoal to Produce Subject Merchandise .......................................................................16

B.    Commerce Erred in Relying on Alleged Differences in the Activation Processes of Wood-Based Charcoal and the Respondents' Coal-Based Carbonized Material ...........................24

CONCLUSION .......................................................................................30

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Albemarle Corp. v. United States*,
   27 F. Supp. 3d.1336 (CIT 2014), *aff'd in part, rev'd in part*, 821
   F.3d 1345 (Fed. Cir. 2016) ...................................................................28

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*,
   419 U.S. 281 (1974)................................................................................14

*Carbon Activated Tianjin Co. v. United States*,
   633 F. Supp. 3d 1329 (CIT 2023)....................................................1, 25

*Carbon Activated Tianjin Co. v. United States*,
   586 F. Supp. 3d 1360 (CIT 2022)....................................................8, 21

*Changzhou Wujin Fine Chemical Factory Co. v. United States*,
   701 F.3d 1367 (Fed. Cir. 2012) .............................................................14

*Consolidated Edison Co. of New York v. National Labor Relations Board*,
   305 U.S. 197 (1938)................................................................................14

*CP Kelco US, Inc. v. United States*,
   949 F.3d 1348 (Fed. Cir. 2020) .............................................................23

*CS Wind Vietnam Co. v. United States*,
   832 F.3d 1367 (Fed. Cir. 2016) ..............................................14, 23, 27

*Downhole Pipe & Equipment, L.P. v. United States*,
   776 F.3d 1369 (Fed. Cir. 2015) ....................................................... 13-14

*Gerald Metals, Inc. v. United States*,
   132 F.3d 716 (Fed. Cir. 1997) ...............................................................14

*Heibei Foreign Trade & Advertising Corp. v. United States*,
   807 F. Supp. 3d 1317 (CIT 2011)..................................................... 28-29

*Jacobi Carbons AB v. United States*,
   443 F. Supp. 3d 1312 (CIT 2020)..........................................................29

*Jiaxing Brother Fastener Co. v. United States*,
    822 F.3d 1289 (Fed. Cir. 2016) ....................................................15, 23

*Motor Vehicle Manufacturers Association of the United States, Inc. v.
    State Farm Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983)............................................................................14

*NMB Singapore Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009) ........................................................14

*Peer Bearing Company-Changshan v. United States*,
    766 F.3d 1396 (Fed. Cir. 2014) ........................................................13

*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) ........................................................15

## STATUTES

19 U.S.C.
    § 1516a........................................................................................14
    § 1516a(b)(1)(B)(i)......................................................................13
    § 1673...........................................................................................3
    § 1677a.........................................................................................3
    § 1677b.........................................................................................3
    § 1677b(a)(1)(A)-(B)(i)...............................................................3
    § 1677b(c)...................................................................................15
    § 1677b(c)(1)................................................................................3
    § 1677f(i)(3)(A)...........................................................................14

28 U.S.C.
    § 1295(a)(5) ..................................................................................1
    § 1581(c)........................................................................................1

## REGULATIONS, ADMINISTRATIVE DECISIONS, AND RULES

*Notice of Antidumping Duty Order: Certain Activated Carbon From
    the People's Republic of China*, 72 Fed. Reg. 20,988 (Dep't
    Commerce Apr. 27, 2007) ....................................................................2

*Certain Activated Carbon From the People's Republic of China: Final Results and Partial Rescission of Third Antidumping Administrative Review*, 76 Fed. Reg. 67,142 (Dep't Commerce Oct. 31, 2011) ............................................................... 17, 27-28

*Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Commerce Nov. 9, 2012).......................................26

*Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 70,533 (Dep't Commerce Nov. 20, 2013) ..................17, 28

*Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 51,607 (Dep't Commerce Nov. 7, 2017) .....................17, 28

*Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Rescission of Administrative Review, in Part; 2018-2019*, 86 Fed. Reg. 10,539 (Dep't Commerce Feb. 22, 2021) ........................................................2

*Final Results of Redetermination Pursuant to Court Remand, Calgon Carbon Corporation, and Norit Americas Inc v. United States, et al*, Slip Op. (CIT Feb. 17, 2011) ...................................................19, 20

*Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Third Antidumping Duty Administrative Review* (Dep't Commerce Oct. 24, 2011) ...................................................................17, 18, 28

*Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Fifth Antidumping Duty Administrative Review* (Dep't Commerce Nov. 2, 2012) ...............................................................................26

*Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Fifth Antidumping Duty Administrative Review* (Dep't Commerce Nov. 20, 2013) .................................................................*passim*

*Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Ninth Antidumping Duty Administrative Review* (Dep't Commerce Nov. 1, 2017) ........................................................................17, 18, 28

Fed. R. App. P. 4(a)(1)(B) ...........................................................................1

**STATEMENT OF RELATED CASES**

Pursuant to Rule 47.5 of the Rules of this Court, counsel for Plaintiffs-Appellants Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation ("Carbon Activated") makes the following statement:

1.     No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate court.

2.     No other action pending before the United States Court of International Trade ("CIT") may be directly affected by the Court's disposition of this appeal.

**JURISDICTIONAL STATEMENT**

This matter is an appeal of the final decision issued by the U.S. Court of International Trade ("CIT") in *Carbon Activated Tianjin Co., Ltd. v. United States*, Court No. 21-00131, affirming the U.S. Department of Commerce's ("Commerce") final remand redetermination pursuant to court order.  The CIT had jurisdiction pursuant to 28 U.S.C. § 1581(c).  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(5).  The CIT issued the final decision and order from which this appeal was taken on April 28, 2023.  *See Carbon Activated Tianjin Co., Ltd., v. United States*, 633 F. Supp. 3d 1329 (CIT 2023) ("*Carbon Activated II*"); Appx48-66.  Carbon Activated timely filed its notice of appeal on June 27, 2023.  Appx5760-5761; Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF ISSUES ON APPEAL

1.      Whether Commerce's selection of the surrogate value to value the respondent's coal-based carbonized materials in the twelfth administrative review of the antidumping duty order on *Certain Activated Carbon From the People's Republic of China* is supported by substantial evidence and otherwise in accordance with law.

2.      Whether the CIT erred by affirming Commerce's surrogate value selection on remand.

## STATEMENT OF THE CASE

There is an antidumping duty order on Activated Carbon from China, published as *Notice of Antidumping Duty Order: Certain Activated Carbon From the People's Republic of China*, 72 Fed. Reg. 20,988 (Dep't Commerce Apr. 27, 2007).  This appeal arises from the final results in the twelfth administrative review ("AR12") of the antidumping duty order, published as *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Rescission of Administrative Review, in Part; 2018-2019*, 86 Fed. Reg. 10,539 (Dep't Commerce Feb. 22, 2021) ("Final Results"); Appx1066-1069.

## I.    STATUTORY BACKGROUND

The Tariff Act of 1930, as amended, provides that an antidumping duty shall be imposed upon "subject merchandise" that "is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673. An antidumping duty is calculated as "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise" when sold in the United States. *Id. See also* 19 U.S.C. §§ 1677a, 1677b. The general rule is that Commerce calculates "normal value" by reference to "the price at which the foreign like product is first sold … for consumption in the exporting country … ." 19 U.S.C. § 1677b(a)(1)(A)-(B)(i). However, in an antidumping duty proceeding involving a nonmarket economy country, such as China, Commerce calculates normal value "on the basis of the value of the factors of production utilized in producing the merchandise … ." 19 U.S.C. § 1677b(c)(1). Specifically, the statute directs Commerce to value the factors of production "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by" Commerce. *See id.* These are commonly referred to as "surrogate values," and the market economy country from which the surrogate values are derived is referred to as the "surrogate country."

This case arises from Commerce's flawed selection of surrogate values for one of the primary inputs used to produce the subject merchandise: coal-based carbonized materials ("carbonized materials" or "carbmat").

## II.    FACTUAL BACKGROUND

### A.    Background on Activated Carbon

The merchandise at issue in this appeal is certain activated carbon. Activated carbon is a solid carbon adsorbent material that is used to soak up pollutants in gas and liquids. *See* Appx3261-3276. Activated carbon can be produced from almost any solid material that has a high carbon content, including, but not limited to, coal, wood, coconut shells, olive stones, and peat. *Id.* The production process to make activated carbon involves specially treating or "activating" the input carbonized material to increase its porosity and surface area, yielding a superior adsorbent material. *Id.* This activation process can involve thermal (heat or steam) activation or chemical activation. *Id.* During thermal activation, carbonized material is placed in a rotary kiln that is maintained at a temperature of approximately 1,000 degrees Celsius and an oxidizing agent, typically steam, is fed to the kiln to remove organic materials and create an internal pore structure in the carbon material. *Id.* In chemical activation, the carbonized material is treated with a strong chemical agent, such as zinc chloride or sulfuric acid, that dehydrates molecules to create internal porosity. Appx4726.

Activated carbon can be used in a diverse range of end uses, including air purification; automobile emissions reduction; solvent vapor recovery; and to remove tastes and odors from drinking water and pollutants from industrial wastewater. *See* Appx3261-3276. The type of input carbonized material and activation method used to make the activated carbon will impact the physical and chemical properties of the finished product, including the surface area, pore size distribution, ash content, and hardness. *Id.*

The U.S. International Trade Commission ("ITC") has recognized that key differences in properties between coconut-shell and coal-based carbmat create distinct end-uses for each product. For example, in its 2018 report for *Certain Activated Carbon From China*, the ITC explained:

> Certain activated carbon made from coconut shells typically has different properties from certain activated carbon made from coal. Specifically, coconut-based activated carbon usually has greater hardness and smaller pore sizes than coal-based activated carbon. These differences may make coconut-based carbon better than coal-based carbon for certain applications, such as gold mining and manufacturing filters for cigarettes. The process of recovering gold from mined ore involves the adsorption of gold on activated carbon. The extra hardness of coconut-based carbon helps to reduce the loss of gold that can occur when the activated carbon particles break into smaller pieces. In cigarette filters, coconut-based carbon may be better than coal-based activated carbon at adsorbing chemicals that affect the flavor of the cigarette. In other applications, these property differences may not be meaningful and either coconut- or coal-based activated carbon can be used.

Appx3268-3269.

In its 2007 report, the ITC also stated:

> Although it appears that coal-based certain activated carbon is generally interchangeable, and that coconut-based certain activated carbon is generally interchangeable, the record indicates that there is very little interchangeability between coal-based and coconut-based activated carbon.

> Information on the record indicates that coal-based and coconut-based activated carbons have different physical structures.[164]  The smaller pore size, pore distribution, and the greater hardness of coconut-based certain activated carbon make it most useful in applications that require removing very small size impurities.  As a result, coal-based and coconut-based activated carbon are generally directed to different uses.  The bulk of coal-based activated carbon is used in the processing of drinking water, industrial wastewater and certain foods, as well as the filtration of air and gas, whereas coconut-based activated carbon is *** to cigarette filters, home water filters, and gold mining.  There is little competition with coal-based carbons in the upscale home filter market due to the premium nature and price of the coconut-based product. Coconut-based activated carbon is largely directed to the aforementioned markets where customers are willing to pay a price premium for this product, because in many other applications coconut-based activated carbon performs worse than coal-based activated carbon.  The limited interchangeability of coconut-based and coal-based activated carbons is further confirmed by record evidence indicating a lack of customer overlap for the two products.  ***.  This shows that coconut- and coal-based activated carbons are being sold to different markets, demonstrating limited substitutability between the two.

*See* Appx3275-3276.

### B.   Commerce's Administrative Review

Commerce initiated AR12 on June 13, 2019, and selected Carbon Activated Tianjin Co. Ltd. and Datong Juqiang Activated Carbon Co. Ltd as the mandatory respondents for this review.  Appx4531.  As this case involves China, a nonmarket

economy country, Commerce determined normal value by applying surrogate values to the respondents' reported factors of production and selected Malaysia as the primary surrogate country. Appx4541-4543. Carbon Activated placed Malaysian import data under Harmonized System ("HS") subheading 4402.90 (covering "wood charcoal (including shell or nut charcoal), excluding that of bamboo) on the record to value its coal-based carbon materials. Appx4562-4626. The petitioner in this case placed Malaysian import data under HS heading 4402.90.1000 (covering "coconut shell charcoal") on the record. *Id*.

Commerce issued the Preliminary Results on April 30, 2020. Appx4627-4631. In the preliminary results, Commerce valued the respondents' coal-based carbonized materials using the Malaysian import data under HS 4402.90.1000, which covers "coconut shell charcoal." Appx4562-4626. Carbon Activated challenged Commerce's selection of the surrogate value for carbonized materials in its administrative case brief. Appx4659-4665. In the Final Results, Commerce continued to select HS 4402.90.1000 as the surrogate value for carbonized materials on the grounds that HS 4402.90 is a basket category covering charcoal made from wood, nuts, and other products, and there was no record evidence indicating that the respondents produced subject merchandise from wood, nuts, or any other non-coal charcoal. Appx4766.

## C.    CIT Decision in *Carbon Activated I*

Carbon Activated appealed the Final Results at the CIT, challenging

Commerce's selection of the surrogate values for carbonized materials and other

factors of production.  The CIT found that Commerce's selection of HS

4402.90.1000 (*i.e.*, coconut shell charcoal) as the surrogate value for carbonized

materials was not supported by substantial evidence and remanded for

reconsideration or further explanation.  *See Carbon Activated Tianjin Co. v. United*

*States*, 586 F. Supp. 3d 1360, 1379 (CIT 2022) ("*Carbon Activated I*"); Appx34-

36.  In reaching this decision, the CIT noted that Commerce had made no finding

as to whether Carbon Activated's suppliers purchased carbonized material made

from coconut shell charcoal.  Thus, the same problem that Commerce identified

with respect to wood-based charcoal—that Carbon Activated's suppliers did not

purchase carbonized material made from wood or nut charcoal—also appeared to

apply to coconut charcoal.  *Id.*  "Absent evidence that Respondents used coconut

charcoal, Commerce's selection of one subheading (coconut shell charcoal) over

another (other wood charcoal) is unsupported by substantial evidence and reasoned

explanation."  Appx35.  The CIT also found that Commerce's reliance on its

findings in the fifth administrative review to justify its approach was unavailing

because "AR5 involved a specific type of activated carbon that could not have

been produced using wood charcoal.  Commerce has not established or indicated

that such is the case in the present review."  Appx35 (internal citation omitted).

### D.    Commerce's Remand Redetermination

Commerce filed its Draft Results of Redetermination ("Draft Remand

Redetermination") on September 29, 2022.  Appx4896-4907.  In the Draft Remand

Redetermination, Commerce reconsidered its surrogate value selection for

carbonized materials and reversed the approach it had taken in the Final Results.

Commerce explained that on further review of the record evidence, it found that

the record contained no evidence that respondents had purchased or used coconut

shell charcoal to produce subject merchandise exported to the United States.

Appx4899-4901.  Commerce also noted that this Court has recognized that wood

charcoal can be used to create the subject merchandise and that wood charcoal and

coconut shell charcoal are comparable with coal-based carbmat.  Appx4901.

Commerce also found that there was no information on the record

demonstrating whether the subject merchandise produced by the mandatory

respondents shared more similarities with wood-based charcoal or coconut shell

charcoal, and that the record did not demonstrate that coconut shell activated

carbon or wood activated carbon was more comparable over the other to coal-

based activated carbon.  Appx4901.  Finally, Commerce also found that the record

did not compare similarities between the three types of carbon.  *Id*.  Therefore,

because the record did not contain sufficient evidence to demonstrate that the

mandatory respondents or their suppliers purchased or consumed either coconut

shell charcoal or wood charcoal to produce the subject merchandise, or that one

surrogate value was more similar than the other to coal-based carbon materials,

Commerce found it was appropriate to use HS 4402.90—the basket category that

included both coconut shell charcoal and other wood charcoal—as the surrogate

value for the coal-based carbonized materials that the respondents used to produce

the subject merchandise.  Appx4901.

Commerce filed its Final Results of Redetermination ("Final Remand

Redetermination") on November 17, 2022.  Appx4792-4824.  In the Final Remand

Redetermination, Commerce reversed the approach it had taken in the Draft

Remand Redetermination.  Although none of the facts that Commerce had relied

upon in its Draft Remand Redetermination had changed—indeed, Commerce

reconfirmed that the record contained no evidence that the mandatory respondents

had purchased or used coconut shell charcoal to produce the subject merchandise,

*see* Appx4799-4800—Commerce nonetheless decided to abandon its selection of

HS 4402.90 (the basket category that included both coconut shell charcoal and

other wood charcoal) as the best available information to value carbonized

materials, and to rely instead on HS 4402.90.1000 (coconut shell charcoal) as the

best available information to value carbonized materials.  Appx4797-4803;
Appx4807-4810.

Commerce based its decision on two factual findings:  *First*, Commerce
found that there was "a long, demonstrable history in this proceeding of using
coconut-shell carbmat in the production of the subject merchandise, unlike wood
carbmat, which has never been used to produce the subject merchandise."
Appx4800.  *Second*, Commerce found that  chemically activated carbon is
generally made using  wood, and the respondents reported only using a steam
activation process to make subject merchandise.  Appx4801-4803.

### E.    CIT Decision in *Carbon Activated II*

The CIT affirmed Commerce's Final Remand Redetermination in *Carbon
Activated II*.  Appx55-57.  In doing so, the CIT relied on Commerce's assertion
that there is "a long, demonstrable history in this proceeding of using coconut-shell
carbmat in the production of the subject merchandise, unlike wood carbmat, which
has never been used to produce the subject merchandise."  Appx56 (internal
citations omitted).  The court also stated that, while each review is separate and
based on the record developed in that review, this "does not prevent Commerce
from acting in accord with prior reviews when the record of the present review
does not contain new or additional facts warranting a departure from the agency's
prior practice{,}" which Commerce concluded was the case here.  Appx57.

On June 27, 2023, Carbon Activated filed its notice of this appeal at the CIT, commencing this action.  Appx5760-5761.

## SUMMARY OF THE ARGUMENT

Commerce's selection of Malaysian import data under subheading HS 4402.90.1000 (coconut shell charcoal) as the surrogate value for the respondents' coal-based carbonized materials is not supported by substantial evidence and is otherwise not in accordance with law.  Commerce based its decision to select HS 4402.90.1000 over the basket category HS 4402.90 on inaccurate and unsupported factual findings, and it was reversible error for the CIT to rely on these inaccurate and unsupported findings to affirm Commerce's determination.

First, Commerce erroneously found there was a "long, demonstrable history in this proceeding of using coconut-shell charcoal in the production of subject merchandise."  Appx4800.  Commerce cited three administrative reviews to support this finding, but in all three reviews the respondents reported using coal-based carbonized materials, not coconut-shell charcoal.  Similarly, the record of this administrative review demonstrated that mandatory respondents did not purchase or use coconut-shell charcoal to produce subject merchandise.  Plaintiff-Appellants called attention to Commerce's mischaracterization of the history of this proceeding in its comments to the CIT; however, the CIT ignored both Plaintiff-Appellants' arguments and record evidence of this administrative review,

and affirmed Commerce's surrogate value selection based on its erroneous and unsupported factual findings.

Second, Commerce erroneously found there are differences in the activation processes used to produce wood-based charcoal and coal-based carbonized materials that support selection of HS 4402.90.1000 (covering coconut-shell charcoal) over HS 4402.90 (the basket category that included both coconut shell charcoal and other wood charcoal). Commerce's findings on this issue are similarly unsupported by substantial evidence, and the authorities that Commerce cited do not support its conclusion that coconut-shell charcoal is a better surrogate value for the respondents' coal-based carbmat than wood-based charcoal.

## ARGUMENT

### I.   STANDARD OF REVIEW

This Court reviews decisions of the CIT *de novo*, applying "the statutory standard of review that the {CIT} applied in reviewing the administrative record." *Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1399 (Fed. Cir. 2014) (citation omitted). Thus, this Court will hold Commerce's determination unlawful if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law{.}" 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "more than a mere scintilla" and amounts to what a "reasonable mind might accept as adequate to support a conclusion," *Downhole Pipe & Equip., L.P.*

*v. United States*, 776 F.3d 1369, 1374 (Fed. Cir. 2015) (quoting *Consolidated Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)), taking into account "whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997). Commerce is also required to provide "an explanation of the basis for its determination that addresses relevant arguments, made by interested parties… ." 19 U.S.C. § 1677f(i)(3)(A). Failure to do so renders the agency's determination unsupported by substantial evidence and therefore unlawful. *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319, 1331 (Fed. Cir. 2009).

The standard of review applied by the CIT under 19 U.S.C. § 1516a also encompasses the "arbitrary and capricious" standard under the Administrative Procedure Act. *See Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)). Failure to consider "an important aspect of the problem" similarly renders an agency determination arbitrary and unlawful. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## II. COMMERCE'S SELECTION OF SURROGATE VALUES FOR CARBONIZED MATERIALS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND SHOULD BE REVERSED

The statute directs Commerce to use the "best available information" on the record in selecting surrogate values.  19 U.S.C. § 1677b(c).  While the statute accords Commerce discretion in determining what constitutes the "best available information," Commerce's decision must nonetheless conform with the substantial evidence standard.  *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  Commerce's decision to select Malaysian import prices under HS 4402.90.1000 (coconut shell charcoal) as surrogate values for the respondents' coal-based carbonized materials is not supported by substantial evidence, rendering its determination unlawful.  *Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1300-1301 (Fed. Cir. 2016).

Commerce's surrogate value selection for carbonized materials—and the CIT's decision to sustain it—is unsupported by substantial evidence because Commerce premised its decision on inaccurate factual findings and mischaracterized its past practice in selecting surrogate values for carbonized materials.  *First*, Commerce's finding that there was a "long, demonstrable history in this proceeding of using coconut-shell carbmat, in the production of the subject merchandise" is factually incorrect.  *Second*, Commerce made flawed factual findings related to purported differences in the activation processes of wood-based

charcoal and the respondents' coal-based carbonized material to justify its

surrogate value selection.  The CIT compounded these errors when it affirmed

Commerce's Final Remand Redetermination based on Commerce's inaccurate

factual findings.  Thus, the Court should reverse the CIT's decision and remand

this case back to Commerce for reconsideration.

> **A.    Commerce Erred in Finding that there is a "Long, Demonstrable History" in this Proceeding of Respondents Using Coconut-Shell Charcoal to Produce Subject Merchandise**

In the Final Remand Redetermination, Commerce found that there is "a

long, demonstrable history in this proceeding of using coconut-shell carbmat in the

production of the subject merchandise, unlike wood carbmat, which has never been

used to produce the subject merchandise."  Appx4800.  This finding was one of the

principal bases that Commerce relied upon to justify its use of the petitioners'

preferred surrogate value in its Final Remand Redetermination, *see id.*, and it was

the principal basis that the CIT cited in affirming Commerce's determination.

Appx56.  However, the record evidence demonstrates that Commerce's finding is

incorrect.

Commerce cited three prior administrative reviews in support of this finding.

Appx4800, n.23.  Contrary to Commerce's finding, in each of the cited reviews,

the mandatory respondents reported using *coal-based* carbonized materials to

produce the subject merchandise, not coconut-shell carbmat.  This fact is readily

apparent from the Issues and Decision Memoranda that Commerce issued

concurrently with its final determinations in each of the reviews.  *See Certain*

*Activated Carbon From the People's Republic of China: Final Results and Partial*

*Rescission of Third Antidumping Administrative Review*, 76 Fed. Reg. 67,142

(Dep't Commerce Oct. 31, 2011) and accompanying Issues and Decision

Memorandum ("AR3 Final IDM") at 14 (explaining why Indian HTS number

4402.90.10 was preferable to HTS number 2704.00.90 to value the respondent's

"coal-based carbonized materials"); *Certain Activated Carbon From the People's*

*Republic of China: Final Results of Antidumping Duty Administrative Review;*

*2011-2012*, 78 Fed. Reg. 70,533 (Dep't Commerce Nov. 20, 2013) and

accompanying Issues and Decision Memorandum ("AR5 Final IDM") at 36

(agreeing with the respondent's choice of surrogate to value its "coal-based"

carbonized materials); *Certain Activated Carbon From the People's Republic of*

*China: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 82

Fed. Reg. 51,607 (Dep't Commerce Nov. 7, 2017) and accompanying Issues and

Decision Memorandum ("AR9 Final IDM") at 23 (noting the respondent's

statement that its suppliers only consumed "coal-based" carbonized material).

　　In addition, Commerce buttressed its decision to adopt the petitioner's

preferred surrogate value on the grounds that it "has consistently selected the more

specific subheading category (*i.e.*, coconut shell charcoal) to value the mandatory

respondents' carbmat in this proceeding." *See* Appx4802.  Commerce is

mischaracterizing the approach it has taken in selecting surrogate values in past

segments of this proceeding.  In reality, AR12 is the first review that involved a

choice between a surrogate value based on a basket HTS heading that covered both

coconut shell charcoal and other wood charcoal (4402.90) and an alternative

surrogate value based on a more specific HTS subheading limited to coconut shell

charcoal (4402.90.1000).[1]

Further, Commerce also supported its finding on the grounds that "{i}n past

Commerce decisions and on remand, because SV information specific to coal-

based carbmat was not available, Commerce found coconut shell charcoal to be the

best available information with which to value mandatory respondents' coal-based

---

[1] Commerce cites the first, third, fifth, and ninth administrative reviews to justify the approach it took in AR12.  None of these reviews involved a selection between a basket HTS heading that covered both coconut shell charcoal and other wood charcoal (4402.90) and an alternative surrogate value based on a more specific HTS subheading limited to coconut shell charcoal (4402.90.1000).  The potential choices of surrogates in the first and third administrative reviews were coconut shell charcoal and "other cokes of coal," an entirely different product covered in a different HTS subcategory (HS 2704.00.90), and Commerce selected the former. *See* AR1 Final Results of Redetermination at 11; AR3 Final IDM at 14.  The potential choices of surrogates in the fifth administrative review were import data for HTS heading 4402 and coconut shell charcoal prices from a coconut industry trade publication, and Commerce selected the latter.  *See* AR5 Final IDM at 35.  The potential surrogates in the ninth administrative review were Thai imports of carbonized materials under HS 4402.90.100000 and coconut shell charcoal prices from the same coconut industry trade publication, and Commerce selected the former.  *See* AR9 Final IDM at 24-26.

carbmat, based on the reported product specifications." Appx4800. The quoted

text is an almost verbatim cut-and-paste from Commerce's IDM for the final

results in AR5. *See* AR5 Final IDM at 36. However, although Commerce cited its

determinations in *Final Results of Redetermination Pursuant to Court Remand,*

*Calgon Carbon Corporation, and Norit Americas Inc v. United States, et al*, Slip

Op. 11-21 (CIT Feb. 17, 2011) ("AR1 Final Results of Redetermination") and

AR5, *see* Appx4800, n.22, it failed to note that the evidence it relied upon to justify

its choice of surrogate values in AR1 and AR5 is not pertinent to the respondents

in AR12 and not on the record of AR12. Thus, Commerce's findings in both

reviews are distinguishable, and neither constitutes substantial evidence in support

of the approach it took in AR12.

Specifically, in AR1, the potential choices of surrogates were Indian HTS

2704.00.90 "Other Cokes of Coal" and Indian HTS 4402.00.10 "Coconut Shell

Charcoal." *See* AR1 Final Results of Redetermination at 9. On one hand,

Commerce found that the record contained "no substantial information on coke

that would support finding that the Indian HTS category 'Other Cokes of Coal' is a

comparable match to the input in question." *Id*. at 10. On the other hand,

Commerce found that coconut shell charcoal shared similar properties with

carbonized material. *Id.* Given those distinctions, Commerce concluded "in this

instance" that "Coconut Shell Charcoal" was a better surrogate for the respondents' coal-based carbonized materials. *Id*. at 10-11.

Similarly, in AR5, the potential choices of surrogates were import data for HTS heading 4402, "Wood Charcoal (Including Shell or Nut Charcoal), Whether Or Not Agglomerated", and coconut shell charcoal prices from a coconut industry trade publication. *See* AR5 Final IDM at 34, 36. The respondent submitted an expert report showing that activated carbon with certain specifications *could not* be produced from wood-based charcoal, and that the subject merchandise it sold in the U.S. market during the POR met those specifications. *See id*. at 34, 36. Commerce relied on this fact for its decision to use the coconut shell charcoal prices from the industry trade publication as the surrogate value in that segment of the proceeding, rather than the import data for HTS heading 4402. *See id.* at 36.

The review at issue in this case, AR12, involved different respondents and different record evidence. Similar to AR1 and AR5, the respondents in AR12 reported using only coal-based carbonized materials to produce the subject merchandise. *See* Appx4766; Appx1143. But unlike in the prior reviews, there is no evidence on the record of AR12 as to whether coconut-shell charcoal or wood-based charcoal was more similar to the respondents' coal-based carbonized materials. Commerce acknowledged this fact in its Draft Remand Redetermination:

> In this administrative review, there is no information on the record which demonstrates whether the subject merchandise produced by the mandatory respondents shares more similarities with wood-based charcoal or coconut shell charcoal. Nor does the record demonstrate that coconut shell activated carbon or wood activated carbon is more comparable over the other to coal-based activated carbon. Moreover, the record does not compare similarities between coconut shell charcoal, wood charcoal, or coal-based carbmat.

Appx4901.

In addition, there is no evidence on the record of AR12 analogous to the product specifications that the respondent submitted in AR5 showing that its subject merchandise *could not* be made from wood-based charcoal. The CIT specifically noted this distinction in *Carbon Activated I*, when it held that Commerce had failed to "establish{} or indicat{e} that such is the case in the present review" or to explain the relevance of its finding from AR5 to its determination in AR12 in light of that distinction. Appx35. As the court correctly found, "{a}bsent evidence that Respondents used coconut shell charcoal, Commerce's selection of {coconut shell charcoal} over {wood charcoal} is unsupported by substantial evidence and a reasoned explanation." *Carbon Activated Tianjin Co., Ltd. v. United States*, 586 F. Supp. 3d 1360, 1379 (CIT 2022); Appx35.

The CIT remanded to Commerce with instructions to provide further explanation or reconsider its surrogate value selection. Appx36; Appx41. And Commerce did reconsider its surrogate value selection in its Draft Remand

Redetermination, finding that the record "contains no evidence that the mandatory respondents purchased or used coconut shell charcoal to produce activated carbon exported to the United States." Appx4900.

Plaintiff-Appellants directed Commerce's attention to this factual finding in their comments on the Draft Remand Redetermination. Appx4910-4911. But instead of acknowledging the finding in its Final Remand Redetermination, Commerce changed tack and stated that there was evidence that one of the mandatory respondents' *suppliers* used carbonized coconut shell in the production of activated carbon, albeit not for sale to the United States as subject merchandise. Appx4809.[2] However, the question before Commerce—and the finding that the CIT had directed Commerce to make—was whether the respondents *themselves* had used or purchased coconut-shell charcoal in their production of subject merchandise, not whether coconut-shell charcoal *could* be used to produce activated carbon for sale outside the United States.

The respondent in question had clearly reported, and provided supporting documentation showing, that the carbonized material it purchased during the POR from each of its suppliers was coal-based, not coconut shell-based. *See* Appx3041.

---

[2] The same supplier also reported using bamboo, *i.e.*, wood-based carbonized material, to make activated carbon. *See* Appx5045-5050. Commerce ignored this fact in its final determination.

Commerce itself acknowledged that the record "contain{ed} no evidence that the mandatory respondents purchased or used coconut-shell charcoal to produce activated carbon exported to the United States." *See* Appx4809 (citing Appx4900). And unlike in AR5, there was no evidence on the record of AR12 that respondents' subject merchandise *could not* be made from wood-based charcoal.

Thus, Commerce's finding that coconut-shell charcoal was the best available information to value the respondents' coal-based carbonized materials because of the allegedly "long demonstrable history" of its use in the production of subject merchandise was not supported by the record evidence of this review. Commerce was required to base its decision making on the record of this review, not prior reviews. *See Jiaxing*, 822 F.3d at 1299 ("Commerce is required to base surrogate country selection on the facts presented in each case, and not on grounds of perceived tradition. '{E}ach administrative review is a separate exercise of Commerce's authority and allows for different conclusions based on different facts of the record.'"). Moreover, in basing its benchmark selection on a conclusory and incorrect statement of its past practice, Commerce failed to provide a reasonable explanation based on the record evidence of this administrative review. *CP Kelco US, Inc. v. United States*, 949 F.3d 1348, 1356 (Fed. Cir. 2020) (quoting *CS Wind Vietnam*, 832 F.3d at 1377) ("Commerce's "statement of what it 'normally' does or has done before … is not, by itself, an explanation of 'why its methodology

comports with the statute.'  Whether it does so in a particularly {Commerce}

decision or in a cited earlier decision, {Commerce} must ground such as normal or

past practice in the statutory standard.").  Commerce's benchmark selection for

coal-based carbonized materials is thus not in accordance with law.

Plaintiff-Appellants called attention to Commerce's misstatements about the

history of the order in the comments on the Final Remand Redetermination that

they submitted to the CIT.  *See* Appx4839-4840.  But in *Carbon Activated II*, the

CIT ignored Plaintiff-Appellants' arguments and merely restated Commerce's

erroneous and unsupported factual findings.  *See* Appx56.

**B.    Commerce Erred in Relying on Alleged Differences in the Activation Processes of Wood-Based Charcoal and the Respondents' Coal-Based Carbonized Material**

The second reason that Commerce gave for its decision to select Malaysian

import data under HS 4402.90.1000 (covering coconut-shell charcoal) over HS

4402.90 (the basket category that included both coconut shell charcoal and other

wood charcoal) was an alleged difference in the activation processes used to

produce wood-based charcoal and coal-based carbonized materials.  Appx4801-

4803.  However, like Commerce's findings on the "long, demonstrable history" of

using coconut-shell carbmat in the production of the subject merchandise,

Commerce's findings on this issue are unsupported by substantial evidence.

Specifically, Commerce found that "the record indicates that wood charcoal generally undergoes an activation process (chemical) that is distinct from that of the coal-based carbmat used by the mandatory respondents (steam/thermal)." *See* Appx4802-4803.  In support of this finding, Commerce cited the respondents' reports that they only used steam activation to make their activated carbon, and a statement in the ITC's report in *Certain Activated Carbon from China* that chemically activated carbon is "generally" made using wood charcoal.  *See* Appx4801-4802.

Commerce erroneously inferred from the ITC's statement that *steam activated carbon* could not be made using wood charcoal.  However, as the CIT correctly recognized in *Carbon Activated II*, Commerce's inference is unfounded: even if it is true that chemically activated carbon is generally made using wood charcoal, it does not automatically follow that steam activated carbon is not or cannot also be made using wood charcoal.  *Carbon Activated II*, 633 F. Supp. 3d at 1335; Appx56.

Further, the record evidence indicates that steam activated carbon *can* be made using wood charcoal.  The scope of the order expressly references wood as a feedstock for subject merchandise that is "activat{e}d with heat and steam," as Commerce itself acknowledged in a prior review.  *See Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty*

*Administrative Review; 2010-2011; Final Results of Antidumping Duty*

*Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Commerce Nov. 9, 2012), and

accompanying Issues and Decision Memorandum ("AR4 Final IDM") at 17

("While Jacobi argues that {wood charcoal} carbonized material cannot be used to

produce activated carbon, the scope of this order references that feedstock for

carbonized material can include wood"); *see also* Appx1016 ("The merchandise

subject to the order is certain activated carbon.  Certain activated carbon is a

powdered, granular, or pelletized carbon product obtained by 'activating' with heat

and steam various materials containing carbon, including but not limited to coal …

, wood, coconut shells, olive stones, and peat.").

In addition, there was other record evidence in the ITC reports regarding the

physical properties and manufacturing process of activated carbon that detracts

from Commerce's conclusion and that Commerce unlawfully ignored.  As

described above, *supra* pp. 4-6, the ITC reports detail key differences in the

physical characteristics between coconut-shell and coal-based carbmat—including

in pore size, pore distribution, and hardness—and how these differences in

physical characteristics impact the end-uses of activated carbon made using

coconut-shell and coal-based carbmat.  Appx3261-3276.  Commerce ignored the

bulk of this evidence and focused instead on a footnote in one ITC report stating

that chemically activated carbon is "generally" made using wood charcoal.  *See*

Appx4801-4802.  Thus, Commerce erred in closing its eyes to evidence that would "fairly detract" from its ultimate conclusion . *See CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016).

Notably, Commerce recognized in its Draft Remand Redetermination that "there is no information on the record which demonstrates whether the subject merchandise produced by the mandatory respondents shares more similarities with wood-based charcoal or coconut shell charcoal.  Nor does the record demonstrate that coconut shell activated carbon or wood activated carbon is more comparable over the other to coal-based activated carbon.  Moreover, the record does not compare similarities between coconut shell charcoal, wood charcoal, or coal-based carbmat."  Appx4901.

Commerce reversed course in the Final Remand Redetermination, stating that it had previously found, and demonstrated before the CIT, that coconut shell carbmat is an appropriate surrogate value for coal-based carbmat because coconut-shell carbmat and coal-based carbmat "share{} many similarities."  Appx4800.  Commerce cited the results of the third, fifth, and ninth reviews.  However, each of these prior reviews is distinguishable from the facts of this case.  In AR3, no party advocated, and thus Commerce did not consider, using wood-based charcoal as a surrogate value for coal-based carbonized materials. *See Certain Activated Carbon From the People's Republic of China: Final Results and Partial Rescission of*

*Third Antidumping Administrative Review*, 76 Fed. Reg. 67,142 (Dep't Commerce Oct. 31, 2011) and accompanying AR3 Final IDM at 14-15. In AR5, a respondent provided evidence that its subject merchandise could not be produced from wood-based charcoal, as discussed above. *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 70,533 (Dep't Commerce Nov. 20, 2013) and accompanying AR5 Final IDM at 34-36. In AR9, Commerce was presented with a choice of two different sources of surrogate values for coconut-based charcoal and Global Trade Atlas import data that covered specialized merchandise from France made using wood-based charcoal, which the respondents did not use. *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 51,607 (Dep't Commerce Nov. 7, 2017) and accompanying AR9 Final IDM at 24-26.

The CIT cases cited by Commerce are similarly inapposite to the record of this review. In *Albermale Corp.* and *Hebei*, the CIT upheld Commerce's selection of the coconut-shell HTS category over a HTS subheading for "Other Cokes of Coal," not a basket subheading encompassing both wood and charcoal and coconut-shell charcoal. *Albemarle Corp. v. United States*, 27 F. Supp. 3d.1336, 1351 (CIT 2014), *aff'd in part, rev'd in part*, 821 F.3d 1345 (Fed. Cir. 2016); *Heibei Foreign Trade & Advertising Corp. v. United States*, 807 F. Supp. 3d 1317,

1319 n.2 (CIT 2011).  In *Jacobi*, Commerce did not assess whether coconut shell

charcoal or wood charcoal shares more similarities with coal-based charcoal.

Rather, Commerce analyzed two sources of surrogate values for coconut shell

charcoal—Malaysian import data and a trade publication, *Cocommunity*, covering

Philippine prices—to determine which was the best available information to value

respondent's coal-based carbonized material.  *Jacobi Carbons AB v. United States*,

443 F. Supp. 3d 1312, 1315 (CIT 2020).  Further, in all of the cited CIT cases, the

court sustained Commerce's selection of a surrogate value on remand, in relevant

part, because no party challenged the remand results.

Thus, neither the authorities cited by Commerce nor the record of this

review supports Commerce's finding that coconut-shell charcoal shares more

similarities with coal-based carbmat than wood-based charcoal.  Commerce's

conclusion that coconut-shell charcoal is a better surrogate value for the

respondents' coal-based carbmat because of their purported similarities and alleged

differences in the activation process of wood-based charcoal is thus unsupported

and erroneous.

*    *    *

In sum, Commerce's decision to select Malaysian import data under HS

4402.90.1000 (covering coconut shell-based charcoal) over HS 4402.90 (the basket

category that included both coconut shell charcoal and other wood charcoal) to

- 29 -

value the respondents' coal-based carbonized materials is based on inaccurate factual findings and a mischaracterization of its past practice in selecting surrogate values for carbonized materials. The CIT erred in repeating Commerce's erroneous and unsupported factual findings. Thus, Commerce's surrogate value selection for carbonized materials is unsupported by substantial evidence and otherwise not in accordance with law.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellants respectfully requests that this Court reverse the CIT's decision in *Carbon Activated II* affirming Commerce's surrogate value selection for carbonized materials and remand the case with instructions requiring Commerce to reconsider its surrogate value selection.

Respectfully submitted,

/s/ David J. Ross

KANZANIRA THORINGTON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center,
250 Greenwich Street
New York, NY 10007
(212) 230-8800

DAVID J. ROSS
STEPHANIE HARTMANN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000

*Attorneys for Plaintiffs-Appellants*
*Carbon Activated Tianjin Co., Ltd.*
*and Carbon Activated Corporation*

November 6, 2023

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

Opinion & Order, Slip Op. 22-89, Sustaining in part and
   remanding in part the final results of the twelfth
   administrative review of the antidumping duty order on
   certain activated carbon from the People's Republic of
   China, Dkt. No. 45 (Aug. 8, 2022) ......................................................... Appx1-47

Opinion, Slip Op. 23-66, Sustaining the U.S. Department of
   Commerce's remand results in the twelfth administrative
   review of the antidumping duty order on certain activated
   carbon from the People's Republic of China, Dkt. No. 59
   (Apr. 28, 2023) ....................................................................................... Appx48-66

Judgment, Dkt. No. 60 (Apr. 28, 2023) ..................................................... Appx67-68

Slip Op. 22-89

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION, DATONG JUQIANG ACTIVATED CARBON CO., LTD., SHANXI INDUSTRY TECHNOLOGY TRADING CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD. and BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> CALGON CARBON CORPORATION and CABOT NORIT AMERICAS, INC., <br><br> Defendant-Intervenor. | Before: Mark A. Barnett, Chief Judge <br> Court No. 21-00131 |

## OPINION AND ORDER

[Sustaining in part and remanding in part the final results of the twelfth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.]

Dated: August 8, 2022

Dharmendra N. Choudhary, Francis J. Sailer, and Jordan C. Kahn, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for Plaintiffs.

Mollie L. Finnan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Patricia M.

**Appx1**

<u>McCarthy</u>, Director, and <u>Claudia Burke</u>, Assistant Director.  Of counsel on the brief was <u>Ashlande Gelin</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>John M. Herrmann</u>, <u>R. Alan Luberda</u>, and <u>Melissa M. Brewer</u>, Kelley Drye & Warren LLP, for Defendant-Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc.

      Barnett, Chief Judge: This matter is before the court following the U.S.

Department of Commerce's ("Commerce" or "the agency") final results in the twelfth

administrative review ("AR12") of the antidumping duty ("ADD") order on certain

activated carbon from the People's Republic of China ("China") for the period of review

("POR") April 1, 2018, through March 31, 2019.  *See Certain Activated Carbon From the*

*People's Republic of China*, 86 Fed. Reg. 10,539 (Dep't Commerce Feb. 22, 2021)

(final results of antidumping admin. review, final determination of no shipments, and

final rescission of admin. review, in part; 2018–2019) ("*Final Results*"), ECF No. 32-3,

and accompanying Issues and Decision Mem., A-570-904 (Feb. 12, 2021) ("I&D

Mem."), ECF No. 32-2.[1]

      Plaintiffs Carbon Activated Tianjin Co., Ltd., Carbon Activated Corporation,

Datong Juqiang Activated Carbon Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Datong

Municipal Yunguang Activated Carbon Co., Ltd., and Beijing Pacific Activated Carbon

---

[1] The administrative record filed in connection with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 32-4, and a Confidential Administrative Record ("CR"), ECF No. 32-5.  Parties filed joint appendices containing record documents cited in their briefs.  *See* Public J.A., ECF Nos. 44 (Vol. I; Tabs 1–11), 44-1 (Vol. II; Tab 12), 44-2 (Vol. III; Tabs 13–18), 44-3 (Vol. IV; Tab 19), 44-4 (Vol. V; Tabs 20–37); Confidential J.A. ("CJA"), ECF Nos. 43 (Vol. I; Tabs 1–12), 43-1 (Vol. II; Tabs 13–18), 43-2 (Vol. III; Tab 19), 43-3 (Vol. IV; Tabs 20-37).  Citations are to the confidential joint appendices unless stated otherwise.

Products Co., Ltd. (collectively, "Plaintiffs" or, in the administrative proceeding, "Respondents"), challenge Commerce's selection of surrogate values for bituminous coal, anthracite coal, hydrochloric acid, carbonized materials, caustic soda, and steam, along with the selection of surrogate financial ratios.  *See* Confidential Pls.' Mot. for J. on the Agency R. Pursuant to Rule 56.2, and accompanying Mem. of Law in Supp. of Pls.' Mot. for J. on the Agency R. Pursuant to USCIT Rule 56.2 ("MJAR"), ECF No. 36; Confidential Pls.' Reply to Def. and Def.-Int.'s Resps. to Pls.' Rule 56.2 Mot. for J. on the Agency R. ("Pls.' Reply"), ECF No. 41.

Defendant United States ("the Government") and Defendant-Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc. (together, "Calgon" or, in the administrative proceeding, "Petitioners") filed response briefs in support of Commerce's determinations—with Calgon focused solely on the valuation of hydrochloric acid.  *See* Def.'s Resp. to Pls.' Mot. for J. on the Agency R. ("Def.'s Resp."), ECF No. 38; Confidential Def.-Ints.' Resp. in Opp'n to Pls.' Mot. for J. on the Agency R. ("Def.-Ints.' Resp."), ECF No. 39.

For the reasons discussed herein, the court sustains in part and remands in part the *Final Results*.

**BACKGROUND**

## I.      Proceedings Before Commerce

In June 2019, Commerce initiated AR12 of the ADD order on activated carbon from China.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 27,587, 27,589–90 (Dep't Commerce June 13, 2019), PR 151, CJA Tab

13.  In July 2019, Commerce selected Carbon Activated Tianjin Co., Ltd. ("Carbon Activated") and Datong Juqiang Activated Carbon Co., Ltd. ("DJAC") as mandatory respondents.  Selection of Respondents for Individual Review (July 1, 2019) at 1, PR 23, CJA Tab 1.  Carbon Activated and DJAC responded to the Department's ADD questionnaires by reporting their factors of production[2] and provided surrogate value information as well as information rebutting the surrogate value information provided by Petitioners.  *See Certain Activated Carbon From the People's Republic of* China, 85 Fed. Reg. 23,947 (Dep't Commerce Apr. 30, 2020) (prelim. results of antidumping duty admin. review, intent to rescind the review in part, and prelim. determination of no shipments; 2018–2019) ("*Preliminary Results*"), PR 271, CJA Tab 28, and accompanying Decision Mem. for the Prelim. Results at 2, A-570-904 (Apr. 24, 2020) ("Prelim. Mem."), PR 259, CJA Tab 26 (describing questionnaire process).

　　　　Because Commerce considers China to be a nonmarket-economy country for the purposes of the unfair trade laws, the agency determines normal value by valuing the factors of production used in producing the subject merchandise, general expenses, profit, and "the cost of containers, coverings, and other expenses" in a surrogate market economy country.  19 U.S.C. § 1677b(c)(1) (2018).[3]  In selecting these "surrogate values," Commerce must, "to the extent possible," use data from a market economy

---

[2] The factors of production "include, but are not limited to--(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

[3] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise specified.

country that is at "a level of economic development comparable to that of the nonmarket economy country" and is a "significant producer[] of comparable merchandise." *Id.* § 1677b(c)(4).

In the underlying proceeding, Commerce identified six potential surrogate countries: Brazil, Bulgaria, Malaysia, Mexico, Russia, and Turkey. Request for Cmts. Re: (1) Economic Development, (2) Surrogate Country and (3) Surrogate Value Information (Sept. 20, 2019), Attach. at 2, PR 104, CJA Tab 6. Respondents and Petitioners submitted comments regarding the surrogate country selection process; Petitioners supported the choice of Malaysia or Mexico as the primary surrogate country, while Respondents advocated for the use of Mexico, Russia, or Brazil. Pet'rs' Cmts. on Surrogate Country Selection at 6, PR 115, CJA Tab 8; Pet'rs' Submission of Surrogate Values at 2, PR 121–22, CJA Tab 10.

On April 30, 2020, Commerce published the preliminary results of AR12. *Preliminary Results.* Therein, Commerce selected Malaysia as the primary surrogate country. Prelim. Mem. at 17.

After addressing challenges to the preliminary calculations by Respondents and responses by Petitioners, Commerce finalized its ADD rates at $1.83/kilogram ("kg") for Carbon Activated, $0.38/kg for DJAC, and $0.65/kg for the non-examined separate rate respondents. *Final Results*, 86 Fed. Reg. at 10,540. Commerce continued to rely on Malaysia as the primary surrogate country for the valuation of all material inputs. *See, e.g.*, I&D Mem. at 28 (identifying Malaysia as the primary surrogate country in the context of Commerce's valuation of anthracite coal). The agency selected Malaysian

company Bravo Green Sdn. Bhd.'s ("Bravo Green") 2018 financial statements to use for calculating financial ratios.  *Id.* at 34.

Plaintiffs subsequently challenged the *Final Results* before this court.  *See* Compl., ECF No. 12.  In particular, Plaintiffs challenge Commerce's surrogate value selections for (1) bituminous coal; (2) anthracite coal; (3) hydrochloric acid; (4) caustic soda; (5) steam; (6) coal-based carbonized materials; and (7) financial ratios.  *See* MJAR at 1–3.

## II.      Legal Framework for Surrogate Country and Surrogate Value Selection

Commerce generally values all factors of production in a single surrogate country, referred to as the "primary surrogate country."  *See* 19 C.F.R. § 351.408(c)(2) (excepting labor); *Jiaxing Brother Fastener Co. v. United States* ("*Jiaxing II*"), 822 F.3d 1289, 1294 & n.3 (Fed. Cir. 2016).  *But see Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,093–94 (Dep't Commerce June 21, 2011) (expressing a preference to value labor based on industry-specific labor values from the primary surrogate country).  The court has acknowledged this practice as a way "to minimize distortion."  *Tri Union Frozen Prods., Inc. v. United States*, 41 CIT __, __, 227 F. Supp. 3d 1387, 1400 (2017); *see also Carbon Activated Tianjin Co. v. United States*, 45 CIT __, __, 547 F. Supp. 3d 1310, 1318 (2021) (also discussing Commerce's preference to value all factors of production in a single surrogate country).

To select a primary surrogate country, Commerce has adopted a four-step approach:

(1) the Office of Policy ("OP") assembles a list of potential surrogate countries that are at a comparable level of economic development to the [non-market economy] country; (2) Commerce identifies countries from the list with producers of comparable merchandise; (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (4) if more than one country satisfies steps (1)-(3), Commerce will select the country with the best factors data.

*Jiaxing II*, 822 F.3d at 1293 (explaining that the primary surrogate country is selected based on "the reliability and completeness of the data in the similarly-situated surrogate countries and [Commerce] generally selects the one with the best data as the primary surrogate country"); *see also* Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), https://enforcement.trade.gov/policy/bull04-1.html (last visited August 8, 2022).

The agency will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."  *Jiaxing Brother Fastener Co. v. United States* ("*Jiaxing I*"), 38 CIT 1404, 1412, 11 F. Supp. 3d 1326, 1332–33 (2014) (citations omitted), *aff'd*, *Jiaxing II*, 822 F.3d 1289.

As previously noted, in selecting surrogate values for the factors of production, Commerce must, "to the extent possible," use "the best available information" from a market economy country or countries that are economically comparable to the nonmarket economy country and are "significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  Commerce, in selecting surrogate values, "generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review."  *Jiaxing II*, 822 F.3d at 1293 (citing *Qingdao Sea-Line Trading Co. v.*

*United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014)); 19 C.F.R. § 351.408(c)(1), (4) (directing Commerce to select "publicly available," "non-proprietary information" to value factors of production and "[m]anufacturing overhead, general expenses, and profit"). Commerce also prefers surrogate values that are input-specific and tax- and duty-exclusive.  *See* Policy Bulletin 04.1; *Jiaxing II*, 822 F.3d at 1293.

There is no hierarchy for applying the surrogate value selection criteria.  *See, e.g.*, *United Steel & Fasteners, Inc. v. United States*, 44 CIT __, __, 469 F. Supp. 3d 1390, 1398–99 (2020); *Hangzhou Spring Washer Co. v. United States*, 29 CIT 657, 672, 387 F. Supp. 2d 1236, 1250–51 (2005) (stating that the court "does not decide . . . whether contemporaneity should be valued over specificity").  Commerce therefore has discretion to choose which criteria to emphasize in selecting the "best available information" so long as it does so in conformity with the substantial evidence standard. *See QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  Commerce must articulate a "rational and reasonable relationship" between the surrogate value and the factor of production it represents.  *Globe Metallurgical Inc. v. United States*, 28 CIT 1608, 1622, 350 F. Supp. 2d 1148, 1160 (2004) (citing *Olympia Indus., Inc. v. United States*, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1001 (1998)).  Due to the discretionary, fact-specific nature of Commerce's determination, the court does not address "whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing II*, 822 F.3d at 1300–01.

"The burden of creating an adequate record lies with the interested parties, not with Commerce." *Qingdao Sea-Line Trading Co.,* 766 F.3d at 1386. Furthermore, the court has upheld Commerce's practice of requiring a party to establish on the record any claims for a particular surrogate value and establish on the record any argument that data are aberrational or unreliable. *See, e.g.*, *Jinan Farmlady Trading Co. v. United States*, 41 CIT __, __, 228 F. Supp. 3d 1351, 1356–57 (2017).

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2018). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

### DISCUSSION

For each factor of production, Commerce found that the data it selected was contemporaneous with the period of review, publicly available, product-specific, tax-exclusive, and representative of a broad market average. I&D Mem. at 17–18, 23–24, 27, 36, 40, 43, 44, 47. The agency also cited its "regulatory preference" to value all factors of production from a single surrogate country to support its choice of Malaysian data for each factor of production. *Id.* at 40, 47.

Plaintiffs challenge Commerce's valuation of six factors of production and selection of the financial statements for the calculation of financial ratios as unsupported by substantial evidence and otherwise not in accordance with law. *See generally* MJAR. The Government contends that Commerce properly exercised its discretion by

choosing Malaysian data for each of the seven factors.  Def.'s Resp. at 13; *cf.* Def.-Ints.'

Resp. at 2–4 (discussing hydrochloric acid).

## I.      Bituminous Coal

Commerce valued all bituminous coal using Malaysian import data under the

Harmonized System ("HS") heading 2701.12, which covers "bituminous coal, not

agglomerated," and constitutes a so-called "basket category" including both coking and

non-coking coal.  I&D Mem. at 16.

Respondents contended that only non-coking coal was used, and that

Commerce therefore should have selected two more-specific subheadings—

2701.12.9000, "bituminous coal: other than coking coal," and 2701.19, "other coal,"—

depending on the supplier or manufacturer.  *See id.* at 13–15.  Respondents argued

that their records indicated use of "Bituminous coal, *not* metallurgical grade," and that

record evidence further indicated that metallurgical grade coal is coking coal.  *Id.* at 13

(emphasis added).  While Respondents conceded that Carbon Activated's supplier

listed one of its inputs as "coking bituminous coal," they asserted that this was a

mistake, as confirmed by a signed declaration to that effect.  *Id.* at 13–14 & n.75 (citing

Case Br. of [DJAC], [Carbon Activated] and Carbon Activated Corp. (July 20, 2020) at 8,

PR 285, CJA Tab 29).

Respondents highlighted evidence describing the transactions, along with an

"independent article" explaining that semi-soft coking coal is not metallurgical coal;

"washed coal" is generally non-coking coal; and coking coal is not suitable for producing

the subject merchandise.  *Id.* at 14.  Respondents additionally noted that the record

showed that DJAC's supplier used coal with the same moisture, ash, and volatility content as Carbon Activated's supplier, which in their view indicated that coal from DJAC's supplier was also non-coking coal.  *Id.* at 14.  They argued that Commerce should have valued Carbon Activated's coal using HS 2701.12.9000 and DJAC's bituminous coal, with its calorific value of less than 5,833 kilocalories ("kcal")/kg, using HS 2701.19.  *Id.* at 15.

Commerce found that "the information on the record [was] insufficient to support the mandatory respondents' assertion that [the two more-specific subheadings were] more appropriate . . . to value their bituminous coal input."  *Id.* at 17.  Commerce also found that the "English translations on the purchase invoices only indicated 'non-coking bituminous coal 1,' 'non-coking bituminous coal 2,' and 'bituminous coal 3.'"  *Id.* at 18.  Underscoring the ambiguity in the record due to invoice discrepancies and translation issues, Commerce stated that "because the record lacks sufficient evidence to support the selection of a more specific HS category within HS 2701.12 to value the bituminous coal used by [Carbon Activated's supplier] or [DJAC's] supplier, or [to] depart from our preliminary selection of HS 2701.12 to value [DJAC's] bituminous coal input, we continue to use HS 2701.12 to value the mandatory respondents' bituminous coal input."  *Id.* at 18.  Regarding DJAC's inputs, Commerce found the declaration from the general manager to be a "mere attestation" that "does not specify the calorific value of the bituminous coal used or any other specification of the coal used which provides distinguishing characteristics for [surrogate value] selection purposes."  *Id.* at 19.

**Appx11**

### a. Parties' Contentions

Plaintiffs contend that because they did not consume coking coal, HS 2701.12 should not have been used to value their bituminous coal because it "fails to provide a product specific and accurate [surrogate value] for the specific non-coking bituminous coal input." MJAR at 11. Similarly, they assert that the values for HS 2701.12 are "distorted by coking coal," making it insufficiently specific to value Plaintiffs' inputs. *Id.* at 10–11; Pls. Reply at 3. Plaintiffs argue that the suppliers' coal inputs were non-coking coal and above the threshold calorific value necessary for valuation under HS 2701.12.9000, and that DJAC's additional coal input of less than the threshold calorific value was non-coking and should have been valued using HS 2701.19. MJAR at 11. Moreover, Plaintiffs contend that "[i]f Commerce required industry standards to value this [factor of production], it was required by statute to 'inform' Carbon Activated 'of the nature of the deficiency' and 'provide . . . an opportunity to remedy or explain the deficiency." *Id.* at 12 (citing 19 U.S.C. § 1677m(d)); *see also* Pls.' Reply at 3.

The Government contends that Commerce's use of the basket category was within the agency's discretion. Def.'s Resp. at 14. Specifically, the Government notes that the record evidence was insufficient to justify departing from the basket category due to translation issues, mis-labeling, lack of test results demonstrating the non-coking quality of the coal, and Respondents' failure to cite to industry standards to demonstrate the category of coal being used. *Id.* at 14–16 (citing I&D Mem. at 17–19). In response to Plaintiff's argument that Commerce was obligated to notify and provide an opportunity to remedy the deficiency in the record, the Government states that "section

1677m(d) does not apply to the submission of potential surrogate value information." *Id.* at 16–17.

In response to the Government's argument that Plaintiffs' evidence was unclear and inconsistent, Plaintiffs contend that their input descriptions were "consistent (and not 'conflicting')" such that the Government's concerns with that evidence are meritless. Pls.' Reply at 3–5. Plaintiffs assert that the sworn declarations "establishe[d] a bright line distinction between coking and non-coking coal" such that industry standards were unnecessary, but that if Commerce required additional documentation, it should have informed Plaintiffs of that requirement. *Id.* at 6. Lastly, Plaintiffs compare this review to previous and subsequent reviews to support their assertion that Commerce's valuation of bituminous coal was erroneous. *Id.* at 8.

### b. Commerce's Decision To Use the Basket Category Is Supported by Substantial Evidence

While Respondents characterized the record evidence as "imply[ing]" the use of "non-coking coal," I&D Mem. at 17, and Plaintiffs here likewise contend that the record is clear in this regard, MJAR at 11; Pls.' Reply at 6, Commerce examined the record evidence and found that it could not evaluate the appropriateness of a more-specific subheading, *see* I&D Mem. at 18. The discrepant translations of the purchase invoice descriptions led Commerce to conclude that the documents were unreliable. *Id.* (citations omitted). The court finds that Commerce sufficiently examined the invoice descriptions and translations and considered the reliability of their contents. The agency explained how it interpreted this information and provided reasoning for why the

invoices and their translations did not support Respondents' claims for a more-specific surrogate value.[4]

It is the respondents' responsibility to build the record to support their desired outcome, and they have failed to do so here.  *See QVD Food Co.*, 658 F.3d at 1324. While Respondents submitted sworn declarations attesting to the use of non-coking coal during production, Commerce found that these declarations "did not provide any specific standard which Commerce [could] use to determine the specificity of the HS subheading preferred by the mandatory respondents."  I&D Mem. at 18.  Thus, Commerce concluded that Respondents did not "fulfil[] their obligation to meet [their] burden [of constructing the record] because they have not provided sufficiently detailed translations . . . [or] provided industry standards differentiating coking quality coal from non-coking quality coal, along with test reports, to substantiate their claim" that they used only non-coking coal.  *Id.*  As to DJAC's inputs, Commerce found that the declarations submitted by DJAC's supplier and DJAC's general manager did not specify the calorific value of the bituminous coal or any other specification of the coal used which could have provided distinguishing characteristics for surrogate value selection purposes.  *Id.*

Plaintiffs' assertion that 19 U.S.C. § 1677m(d) required Commerce to request additional information is unavailing.  "[W]hen a party claims that a particular surrogate is

---

[4] Because the court finds that Commerce's choice of the basket category over a more-specific subheading was supported by substantial evidence, it need not address Plaintiffs' claims that the basket category was distorted by the inclusion of coking coal. *See* MJAR at 10–11, Pls.' Reply at 1.

not appropriate to value the [factor of production] in question, [Commerce] has

determined that the burden is on that party to prove the inadequacy of said [surrogate

value] or, alternatively, to show that another value is preferable." *Ad Hoc Shrimp Trade*

*Action Comm. v. United States*, 40 CIT __, __, 145 F. Supp. 3d 1349, 1363 (2016). To

the extent the record did not support Respondents' preferred surrogate value for the

bituminous coal, the burden was on Respondents to provide such evidence. Section

1677m(d) is inapposite to such a situation and does not obligate Commerce to request

additional information in support of Respondents' request.

Commerce's determination that the record did not support the selection of the

more-specific subheadings, and its corresponding selection of the basket category, is

supported by substantial evidence. Commerce weighed the evidence on the record and

exercised its discretion in determining the best information available. *See* 19 U.S.C.

§ 1677b(c)(1), (4). While there was some evidence on the record related to the

moisture, ash, and volatility contents of the coal, I&D Mem. at 17, Commerce also found

that the record did not include industry standards or accurate translations of the invoices

necessary to support the subheadings requested by Plaintiffs, *id.* at 18–19. Plaintiffs fail

to identify any error in the agency's analysis. Instead, they largely reassert the

arguments they made to the agency. However, the court does not reweigh evidence.

*See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376–77 (Fed. Cir.

2015) (citing *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975

F.2d 807, 815 (Fed. Cir. 1992)). Thus, the court will sustain Commerce's selection of

Malaysian HS 2701.12 to value inputs of bituminous coal.

**Appx15**

## II.     Anthracite Coal

Commerce valued anthracite coal using Malaysian import data under HS 2701.11, the basket category covering "Anthracite Coal, whether or not pulverized, but not agglomerated."  I&D Mem. at 27–29.

Respondents claimed that the anthracite coal used in the production of subject merchandise had a volatility content below ten percent.  *Id.* at 26.  Because the Russian tariff schedule includes a narrower category for anthracite coal characterized by "maximum yield of volatile substances of not more than ten percent mass fraction," Respondents requested that Commerce use Russian import data under HS 2701.11.1000 rather than the Malaysian basket category.  *Id.*  Respondents asserted that this Russian category indicates that Commerce should view volatility content as "one of the most significant product characteristics" and choose surrogate data for anthracite coal based on its volatility content.  *Id.* at 28.

Commerce found that Russia's sub-categorization based on volatility content was insufficient to consider volatility content one of the most important characteristics and it noted that "the Malaysian HS does not provide a tariff subheading for HS 2701.11 based on volatility content."  *Id.*  Commerce thus declined to "depart from [its] preliminary decision to rely on data from the primary surrogate country."  *Id.*

Commerce also found that the Malaysian data was reliable and available.  *Id.*  Commerce considered the representativeness of the Malaysian data by comparing the Malaysian values for HS 2701.11 to values for this subheading from Brazil, Bulgaria, Mexico, Russia, and Turkey.  *Id.* at 29.  Commerce found that the Malaysian data was

not "aberrational in comparison to the [average unit values ("AUVs")] from other countries on the OP List."  *Id.* at 29.  Commerce also found that the Malaysian data were "sufficiently representative of a broad market average."  *Id.*

### a.  Parties' Contentions

Plaintiffs contend that Russian data for HS 2701.11.1000 provides the most specific data source "from an approved country" and "specific to the input in question" because Russia categorized anthracite coal based on volatility content.  MJAR at 35. (citation and emphasis omitted); *see also* Pls.' Reply at 19.  Plaintiffs assert that volatility content was sufficiently important to justify departing from the primary surrogate country's data even absent evidence of aberrancy or unreliability of the Malaysian data.  *See id.* at 35–37.

The Government asserts that volatility content was neither the only criterion nor the most important one.  Def.'s Resp. at 18 (citing I&D Mem. at 27).  Considering Commerce's balancing of the various product characteristics and its comparison of the potential datasets on the record, *see id.* at 19, the Government avers that Plaintiffs have "failed to establish that volatility content should be the driving factor" in the selection of the HS category, *id.* at 20.  As such, the Government contends, the record did not support departure from the primary surrogate country in favor of Russian data.  *Id.* at 20–21.

In their reply, Plaintiffs assert that the Russian data was superior to the Malaysian data both because it subdivides based on volatility content but also because the import quantity was far greater than the Malaysian data.  Pls.' Reply at 19.  Plaintiffs

argue that Commerce failed to address the superiority of the Russian data for the sole reason that Malaysia was the primary surrogate country.  *Id.*

### b. Commerce's Decision To Use Malaysian HS 2701.11 Data Is Supported by Substantial Evidence

Commerce substantiated its decision to use Malaysian data to value anthracite coal by comparing the Malaysian data with that of the alternative surrogate countries. *See* I&D Mem. at 29.  Commerce found that the volume of the Malaysian imports (484,415,312 kg) compared to other countries' import volumes was representative because it was within the range of volumes from the other surrogate country options: Brazil (1,681,143,359 kg); Bulgaria (350,489,586 kg); Mexico (46,535,076 kg); Russia (4,372,971,252 kg); and Turkey (940,396,419 kg).  *Id.*  Moreover, the Malaysian data, as noted by Commerce, falls within the range of AUVs for the six countries examined: the Malaysian AUV is $199.6 (in U.S. dollars per metric ton), compared to values of $119 (Brazil), $163.8 (Bulgaria), $250.3 (Mexico), $37.3 (Russia), and $130.3 (Turkey). *Id.*  Plaintiffs' attempt to establish the Russian data as superior is unconvincing when the record shows that the Russian AUV was an outlier as compared to the other AUVs, at roughly one-third of the next-lowest value, while the Malaysian data was "not aberrational" and was based on sufficient imports to be representative of a broad market average.  *Id.*  In sum, Commerce compared the Malaysian volume and value of imports to the other record data and substantiated its decision that the Malaysian data was sufficiently representative of a broad market average.

Commerce additionally considered Plaintiffs' arguments related to volatility content and found that the mere fact that Russian data includes a volatility-based subclassification was not enough to establish that volatility is an important characteristic. *Id.* at 28. Commerce thus considered the merits of prioritizing volatility content but found that Russia's use of this subclassification was an insufficient basis to diverge from the primary surrogate country, particularly when other countries, Malaysia included, do not disaggregate based on volatility. *See id.* Before this court, Plaintiffs identify no error by Commerce and simply seek to have the court reweigh evidence presented to Commerce. This the court will not do. *See Downhole Pipe*, 776 F.3d at 1376–77.

Based on the foregoing, the court finds that Commerce's valuation of anthracite coal is supported by substantial evidence and reasoned explanation, and it will be sustained.

### III.    Hydrochloric Acid

To value hydrochloric acid, Commerce selected Malaysian import data for HS 2806.10, which covers "hydrogen chloride (hydrochloric acid)," and which constitutes a basket category including both anhydrous hydrogen chloride and aqueous hydrochloric acid. I&D Mem. at 40. "HCl" is the chemical formula for hydrogen chloride; the parties have used this term interchangeably with hydrochloric acid and hydrogen chloride, despite the distinctions in their form.

Respondents argued that they utilized aqueous hydrochloric acid in the production of subject merchandise, whereas the basket category selected by

Commerce, HS 2806.10, covers both aqueous and anhydrous hydrogen chloride and is not specific to their input.  *Id.* at 37–38.  Carbon Activated requested that Commerce instead value "HCl" using import data for aqueous HCl from Brazilian or Turkish HS classifications.  *Id.* at 38.  Respondents also contended that certain record documents describe hydrochloric acid and its composition and that these documents establish that they used aqueous HCl.  *Id.*

Commerce found that "the evidence on the record only demonstrates the purity level for HCl that [Carbon Activated] used in October 2018."  *Id.* at 40.  Commerce further found that the record did not contain specific information indicating whether the HCl that Respondents procured and consumed during the POR was aqueous or anhydrous.  *Id.* at 40–41.  Commerce considered the documents provided by Respondents and found that Respondents "failed to provide an explanation as to how these documents tie to the [surrogate value] and actual consumption of the HCl that they reported for the POR."  *Id.* at 41.

### a.  Parties' Contentions

Plaintiffs contend that record evidence establishes that they used aqueous HCl to produce subject merchandise and, as such, Commerce should have used a subheading specific to aqueous HCl.  MJAR at 29–30.  They assert that the evidence on the record regarding purity content necessarily means that the HCl is aqueous.  *Id.* at 29; *see also* Pls.' Reply at 14–15.   Plaintiffs assert that the Malaysian basket category does not provide adequate specificity, but that the Brazilian or Turkish data contain specific

classifications for aqueous HCl and Commerce should have selected data from one of those countries instead.  *Id.* at 30–31.

The Government contends that Plaintiffs failed to substantiate their claim that their inputs constituted aqueous HCl and that the Malaysian data was therefore appropriate.  Def.'s Resp. at 21.  The Government further contends that use of a purity level metric does not, "standing alone," indicate the state of the substance.  *Id.* (citing I&D Mem. at 40–41).  The Government argues that there is no "other reason to depart from what Commerce had determined to be available and reliable data from the primary surrogate country."  *Id.*

Calgon similarly contends that there was insufficient record evidence to conclude that Respondents purchased HCl in its aqueous form.  Def.-Ints.' Resp. at 2–4.  They note that the purity level evidence on the record not only does not clarify the state of the HCl, but also does not specify the form of the HCl at the time it was acquired, providing evidence only about the HCl used in production[5].  *Id.* at 3.  Calgon also points to additional evidence that water was consumed in addition to the HCl "in preparing the acid bath used to wash the subject merchandise," suggesting to Calgon that the HCl was diluted after it was purchased.  *Id.* at 4.

---

[5] Calgon also points to additional evidence that water was consumed in addition to the HCl "in preparing the acid bath used to wash the subject merchandise," suggesting that the HCl was diluted after it was purchased.  Def.-Ints.' Resp. at 2–4.  This argument is not addressed in the Issues & Decision Memorandum, and as such, it is not discussed further in the analysis.

### b. Commerce's Use of Malaysian Data under HS 2806.10 to Value Hydrochloric Acid Is Supported by Substantial Evidence

It is the respondents' burden to build the record that supports their desired outcome. *QVD Food Co.*, 658 F.3d at 1324. Here, Commerce reasonably found that Respondents had "only demonstrate[d] the purity level for HCl that it used in October 2018. The record does not contain specific information indicating whether the HCl that the [ ] respondents procured and consumed during the [period of review] was in a water solution, a concentrated liquid form, or a different state." I&D Mem. at 40–41.

In support of their assertion that they used aqueous HCl, Plaintiffs cite to a document that provided limited information, was not fully translated, and did not state that the HCl was dissolved in water. MJAR at 28 (citing Carbon Activated Sec. D Suppl. Questionnaire Resp. (Part I) (Mar. 18, 2020), Ex. SD-1 ("October 2018 Test Report"), CR 171–79, PR 184–90, CJA Tab 16). The document contains the description, "HCl Test Report for October 2018," and includes the terms "date," "purity," and "inspector." October 2018 Test Report. Plaintiffs assert that a "purity level [of] less than 100 [percent] means that the HCl is necessarily in an aqueous solution – as confirmed by record evidence and Commerce practice." MJAR at 29. They further assert that "[t]he record confirms that HCl exists in two forms: '(1) anhydrous or liquid form (without added water); and (2) aqueous solution (with added water),'" where "the latter form is expressed with purity levels." *Id.* (citing Final Surrogate Value Cmts. by DJAC and [Carbon Activated] Tianjin (Mar. 30, 2020) ("Final SV Cmts."), Ex. 6B, PR 179–231, CJA Tab 19). In fact, the record indicates that hydrochloric acid is "the aqueous (water-

based) solution of hydrogen chloride gas," "a colorless watery liquid . . . [consisting] of

hydrogen chloride, a gas, dissolved in water"—but Plaintiffs fail to address how this

distinction between hydrochloric acid and hydrogen chloride applies when the test

report on the record only describes "HCl."  *See* Final Surrogate Value Cmts., Ex. 6B.

Commerce found that the referenced documents do not specifically describe the

connection between the substance at issue in this case (HCl with a purity level less than

100 percent) and the substance those documents described (aqueous hydrochloric

acid).  I&D Mem. at 41.  Indeed, the October 2018 Test Report on which Plaintiffs rely

states only "HCl Test Report for October 2018" and the translation for the term "purity,"

but it does not anywhere explain that the only contaminant was water such that its purity

level of less than 100 percent pure means that it is aqueous hydrochloric acid.  *See*

October 2018 Test Report.  Accordingly, Commerce reasonably assessed that the

evidence was insufficient to clearly define the HCl on the record as aqueous

hydrochloric acid or to depart from the Malaysian basket category in favor of the

narrower Brazilian or Turkish aqueous HCl data.  *See* I&D Mem. at 41.

Having reviewed the record evidence and Commerce's explanation, the court

finds that Commerce's decision to rely on the Malaysian basket category is based on

substantial evidence and in accordance with law; thus, it will be sustained.

**IV.    Caustic Soda**

Commerce valued caustic soda using Malaysian import data under HS 2815.11,

which covers "solid sodium hydroxide."  I&D Mem. at 44.  Respondents requested that

Commerce instead value caustic soda using the subheading 2815.12, which covers

"liquid sodium hydroxide." *Id.* Parties refer interchangeably to "sodium hydroxide" and "caustic soda."

Commerce concluded that the record did not establish that Respondents purchased liquid caustic soda. *Id.* at 44–45. Commerce noted that the suppliers used "sodium hydroxide with purity in the range of 30.6 to 33.1 percent," which Commerce saw as insufficient to establish that the caustic soda was in liquid form. *Id.* at 45. Commerce also noted that one of the respondents consumed more caustic soda than it purchased. *Id.* Although the record was unclear, from this evidence Commerce inferred that "Carbon Activated's suppliers [likely] purchased solid sodium hydroxide and created the liquid caustic solution themselves." *Id.* Based on this analysis of the record evidence, Commerce continued to use HS 2815.11 to determine the surrogate value for caustic soda. *Id.*

### a. Parties' Contentions

Plaintiffs contend that HS 2815.12 should be used to value caustic soda because it "was clearly reported as a liquid input with diluted purity." MJAR at 26. Plaintiffs assert that Commerce "impermissibly speculated that 'Carbon Activated's suppliers actually purchased solid sodium hydroxide and created liquid caustic themselves' as opposed to having purchased 'liquid sodium hydroxide in its diluted form.'" *Id.* at 27 (quoting I&D Mem. at 45). Plaintiffs also assert that Commerce was required to inform Carbon Activated about the deficiency of the record in this regard and provide Carbon

Court No. 21-00131                                                          Page 25

Activated with an opportunity to remedy or explain the deficiency.  *Id.* at 28 (citing 19

U.S.C. § 1677m(d)); *see also* Pls.' Reply at 13.

       The Government contends that Commerce's choice of the solid caustic soda

subheading constituted an inference based on evidence, not mere speculation.  *See*

Def.'s Resp. at 28–29.  The Government further contends that Commerce was not

required to ask Respondents for clarification before drawing conclusions or inferences

because 19 U.S.C. § 1677m(d) "does not apply to the submission of potential surrogate

value information."  *Id.* at 29.

> **b.  Commerce's Use of Malaysian Data for Solid Sodium Hydroxide to Value Caustic Soda Is Supported by Substantial Evidence**

       While Plaintiffs contend that Commerce's caustic soda valuation was based on

speculation and not substantial evidence, Commerce's determination in fact constituted

an evidence-based inference.  Plaintiffs claim that they consumed liquid caustic soda in

their production of subject merchandise; however, Commerce noted that "the evidence

on the record only indicates that the suppliers used [caustic soda] with purity in the

range of 30.6 to 33.1 percent, as demonstrated by the test reports provided for October

2018."  I&D Mem. at 45.  Commerce also found that "something happen[ed] to the

caustic soda input after its purchase because once the input is applied into the

production process, the volume reported is larger than the volume purchased."[6]  *Id.*

This difference in volume, in Commerce's view, justified an "infer[ence]" that the input

---

[6] The details of the volumes of caustic soda purchased and used are business proprietary.  *See* Carbon Activated Resp. to Section D. of Questionnaire (Part I) (Sept. 19, 2019) at Ex. D-4, D-5, Attach. A, Ex. D-5, D-12.4, PR 102, CJA Tab 4,.

was solid caustic soda, and that the suppliers created the liquid caustic soda from a

purchased solid.  *Id.*  Commerce took the evidence it had on the record—a difference in

volume purchased and volume consumed—and drew a conclusion based thereon.

 While Plaintiffs maintain, and the court acknowledges, that there may be

additional explanations for the purchase-to-consumption difference other than the

inference drawn by Commerce—such as, Plaintiffs claim, purchases of caustic soda

outside of the POR, MJAR at 27—substantial evidence review requires the court to

determine whether Commerce's conclusion was reasonable, not whether the conclusion

was the only possible one, *see Jiaxing II*, 822 F.3d at 1301.  Plaintiffs' alternative

explanation was not exhausted below nor do Plaintiffs point to record evidence ignored

by Commerce when adopting its inference.  Because Plaintiffs did not raise their

alternative explanation for the volume discrepancy before Commerce, the agency drew

its own conclusion.  Direct evidence, or "evidentiary exactitude," need not support

Commerce's determination; insofar as Commerce's inference is logical under the

circumstances, the court finds that it is supported by substantial evidence.  *See, e.g.*,

*Fuwei Films (Shandong) Co. v. United States*, 36 CIT 764, 774–75, 837 F. Supp. 2d

1347, 1356 (2012) (finding that "the question [was] not whether Commerce engaged in

'conjecture' that fail[ed] to qualify as 'substantial evidence, . . . but simply whether

Commerce's findings and conclusions supporting its ultimate determination. . . [were]

reasonable given the circumstances presented by the record").

 Plaintiffs' contention that Commerce was required, pursuant to 19 U.S.C.

§ 1677m(d), to request clarification about the nature of the input fails for the same

reasons discussed above regarding bituminous coal, *supra* at 14–15.  As described,

Commerce found that it had enough information to find a surrogate value for caustic

soda.  *See* I&D Mem. at 45.  Plaintiffs were under an obligation to populate the record to

"prove the inadequacy of [Commerce's chosen surrogate value] or, alternatively, to

show that another value is preferable."  *Ad Hoc Shrimp*, 145 F. Supp. 3d at 1363.

Plaintiffs did not meet that burden here, and the court will not shift that burden to the

agency.

        Thus, Commerce's reliance on Malaysian import data under HS 2815.11 will be

sustained.

   **V.      Steam**

        Commerce valued steam using Malaysian import data under HS 2711.11, which

covers liquefied natural gas.  I&D Mem. at 47–48.  The agency "valued steam by

benchmarking the cost of steam from the cost of natural gas required to generate

steam" and then developed a "ratio to convert [the] cost of natural gas to the cost of

steam."  Mem. Surrogate Values for the Prelim. Results (Apr. 24, 2020) ("Prelim. SV

Mem.") at 6, Attach. 2 to Mem. Re: Calculation of the Margin for Respondents Not

Selected for Indiv. Examination (Apr. 24, 2020), PR 265–68, CJA Tab 27.

         Respondents challenged the liquefied natural gas price as unreliable and not

product-specific; they requested that Commerce instead use HS 2711.21, covering

"gaseous natural gas."  I&D Mem. at 45.  They also argued that because Malaysia did

not have any imports under HS 2711.21 during the POR, Commerce should have

selected data from the secondary surrogate country with the largest import volume,

Mexico, to value steam using HS 2711.21.  *Id.*  Respondents argued that Malaysian data for HS 2711.11 were unreliable because the domestic prices of natural gas during the POR were lower than the import prices of natural gas.  *Id.* at 45–46.

Commerce determined that Malaysian data existed for both HS 2711.21 and HS 2711.11, and, in this case, the data for 2711.11 was preferable.[7]  *Id.* at 48.  Commerce acknowledged that, in other reviews, it calculated the surrogate value for steam using import data under both HS 2711.21 and HS 2711.11.  *Id.* at 47–48 & nn.321–22 (citations omitted).  Here, the agency found that the Malaysian data for HS 2711.11 represented "a significantly larger volume of imports (i.e., 1,329,366,876 kg) from multiple countries (i.e., Singapore, Brunei, and Australia), covering nearly the entirety of the POR," as compared to the import data under HS 2711.21, which represented a "smaller volume of imports (i.e., 3,207,783 kg) from only one country (i.e., Brunei) covering only two months of the POR."  *Id.* at 48.  Commerce addressed Respondents' argument regarding domestic natural gas prices by explaining that the "domestic prices the . . . [R]espondents provide[d were] not supported by the underlying methodology used to derive those prices."  *Id.*  Consequently, Commerce found the Malaysian import data reliable and declined to "consider import data from a secondary surrogate country."  *Id.*

---

[7] Contrary to Plaintiffs' assertion, Commerce found that Malaysia imported 3,207,783 kg of natural gas under HS 2711.21 during the POR.  I&D Mem. at 47.

### a. Parties' Contentions

Plaintiffs contend that Commerce should have used HS 2711.21 because Commerce typically selects the surrogate value for steam based "on whether the natural gas was purchased in gaseous or liquefied state," and the steam used by Respondents was gaseous.  MJAR at 31–32 (citation omitted) (asserting that because "Commerce never questioned the manner in which steam was reported," i.e., gaseous, "it should have been valued as natural gas in the same physical form, i.e., gaseous"); *see also* Pls.' Reply at 18.  Plaintiffs also contend that Malaysian import data under HS 2711.11 was unreliable because products under this subheading were sold at higher prices than in the domestic market, making it unlikely that Malaysian producers would have purchased imported natural gas.  MJAR at 33–34 (citing *Yantai Oriental Juice Co. v. United States*, 26 CIT 605, 617 (2002)); *see also* Pls.' Reply at 18.  Lastly, Plaintiffs contend that "Commerce improperly compared import volumes reported under two different [HS] subheadings covering distinct products," and that "Commerce failed to provide any precedent to support comparing the broad market average attributes of disparate [HS] subheadings."  *Id.* at 34.

The Government contends that if "there is nothing on the record regarding the specific composition [of an input]"—in this case, whether the natural gas used to create the steam was liquid or gaseous—then claims regarding the greater specificity of certain HS subheadings are unavailing.  Def.'s Resp. at 31 (quoting *Fine Furniture (Shanghai) Ltd. v. United States*, 42 CIT __, __, 353 F. Supp. 3d 1323, 1348 (2018)) (alteration in original)).  The Government further contends that Plaintiffs' argument regarding

unreliability lacks merit because Commerce could not determine how domestic prices were determined or evaluate the reliability of that data.  *Id.* (citing I&D Mem. at 48). Thus, the Government contends, Commerce's choice of Malaysian import data under HS 2711.11 constituted a reasonable exercise of the agency's discretion to choose between imperfect datasets.  *Id.*

### b. Commerce's Valuation of Steam using Malaysian HS 2711.11 Data Is Supported by Substantial Evidence

Plaintiffs' first argument, that steam should be valued using the HS subheading for natural gas that is consistent with the phase of matter in which the steam is in, *see* MJAR at 31–32, is nonsensical and inapposite.  While steam is certainly gaseous, it is created by using an energy source to heat water.  To that end, the energy source input need not be in the same phase (solid, liquid, gaseous) as the steam the energy creates. The only question is whether the conversion factor is correlated to the value of the particular energy source selected as the surrogate value.  *See* Prelim. SV. Mem. at 6. Commerce was not required to select gaseous natural gas simply because the steam was gaseous.  Indeed, Commerce declined to do so.  *See* I&D Mem. at 47–48. Moreover, the court notes that Plaintiffs do not argue that the conversion factor Commerce used to convert the value of the liquified natural gas to a value for steam was inaccurate for that purpose.

Turning to Commerce's choice of HS 2711.11, Commerce explained that the data under HS 2711.11 "represent a significantly larger volume of imports . . . from multiple countries . . . , covering nearly the entirety of the POR" as compared to "the

import data under HS 2711.21," which "represent a smaller volume of imports . . . from only one country . . . covering only two months of the POR."  I&D Mem. at 48.

The agency also noted that the domestic price data, which Respondents used to argue that the HS 2711.11 data were unreliable, were themselves of undetermined reliability because Respondents had not provided Commerce with the underlying methodology used to derive those prices.  *Id.*  Plaintiffs cite to *Yantai Oriental Juice Co.*, 26 CIT at 617, to support their argument that Commerce was required to select HS 2711.21 in part because the Malaysian imported natural gas prices under HS 2711.11 were significantly higher than the domestic prices of the same product.  However, in that case, "Commerce nowhere explain[ed] how the use of seemingly more expensive imported coal data [was] the best available information," *id.* at 617, whereas here, Commerce found that the domestic price data was unreliable *and* found that the HS 2711.11 data were better due to the volume and contemporaneity of the import data under that subheading, I&D Mem. at 48.

As noted above, Commerce has discretion to choose which criteria to prioritize, especially when there is "nothing on the record regarding the specific composition" of the plaintiff's product such that "claims of greater specificity . . . are immaterial."  *Fine Furniture (Shanghai) Ltd. v. United States*, 353 F. Supp. 3d at 1348.  Like in *Fine Furniture*, here, the agency found that there was no way to determine which surrogate value was most appropriate due to lack of evidence regarding the state of the natural gas used to generate the steam.  I&D Mem. at 48.  While Commerce did not use a basket category—in fact, no basket category has been proposed—Commerce selected

what it deemed to be the best available information by examining differences between

the two datasets and explaining why it preferred HS 2711.11 over HS 2711.21.  *See id.*

The court declines to interfere with Commerce's exercise of its discretion in

selecting among potential surrogate values because the agency adequately explained

its choice and supported its choice with substantial evidence.  Thus, Commerce's

determination as to the valuation of steam will be sustained.

**VI.    Carbonized Materials**

Commerce valued coal-based carbonized material using Malaysian data for HS

4402.90.1000, which covers "coconut shell charcoal."  I&D Mem. at 43.  Respondents

requested that Commerce instead use HS 4402.90, which covers "wood charcoal

(including shell or nut charcoal), excluding that of bamboo," and which is the basket

category inclusive of HS 4402.90.1000 and HS 4402.90.9000, covering "other wood

charcoal."  *Id.* at 41, 43.  According to Commerce, there was no record evidence

"indicating that the mandatory respondents produced subject merchandise from wood,

nuts, or any other non-coal charcoal."  *Id.* at 43.  Commerce noted that, "when asked to

specify the type of carbonized material used to produce subject merchandise, Carbon

Activated reported that its suppliers purchased coal-based carbonized material."  *Id.*

Commerce further stated that "[f]or both [DJAC's] and Carbon Activated's suppliers, the

record only contains test reports demonstrating the moisture, ash, volatility content and

particle size of the carbonized material purchased from its suppliers, but no evidence to support the mandatory respondents' assertion that they used wood-based charcoal." *Id.*

### a. Parties' Contentions

Plaintiffs contend that Commerce unlawfully rejected HS 4402.90.9000 for the valuation of carbonized materials because "Commerce failed to demonstrate that coal-based carbonized material was identical to coconut shell charcoal." MJAR at 17. Plaintiffs highlight evidence indicating that the wood-based charcoal in HS 4402.90.9000 "is comparable to coal-based carbonized materials in terms of key properties and cost," and that "Commerce's failure to address this critical point . . . invalidates" its choice of HS 4402.90.1000. *Id.* Plaintiffs also assert that Commerce's citation to the fifth administrative review of the order on certain activated carbon from China ("AR5"), in which the agency found that wood and non-coconut-shell carbonized material would only be applicable if a respondent had sold subject merchandise produced from these types of charcoal, was inappropriate. *Id.* (citing *Certain Activated Carbon From the People's Republic of China*, 78 Fed. Reg. 70,533, 70,533 (Dep't Commerce Nov. 6, 2013) ("*AR5 Final Results*"), and accompanying Issues and Decision Mem., A-570-904 (Nov. 20, 2013) ("AR5 I&D Mem.")). Plaintiffs explain that there is no record evidence here establishing that the subject merchandise could not have been produced from wood charcoal, which distinguishes this review from AR5. *Id.* at 17–18 (citations omitted). Plaintiffs accordingly contend that Commerce should have selected the basket category HS 4402.90. *Id.* at 18–19.

The Government contends that that there is "no reason to resort to the basket category" for carbonized material because the record does not demonstrate that Respondents "used any carbonized materials made from wood, nuts, or any other non-coal charcoal." Def.'s Resp. at 23 (citing I&D Mem. at 43). Thus, the Government contends, consistent with AR5, Commerce could not select HS 4402.90.9000 because there was no evidence of the use of wood charcoal. *Id.* at 24–25. The Government asserts that Commerce was "well-within its discretion to choose among imperfect datasets" in selecting HS 4402.90.1000. *Id.* at 26.

Plaintiffs in their reply assert that record evidence establishes that "wood charcoal is an equally viable proxy to coal-based carbonized material" compared to coconut shell charcoal. Pls.' Reply at 9. Plaintiffs also reiterate their argument that the AR5 findings were inapposite, and they reiterate that even if the choice between "imperfect alternatives" is discretionary, Commerce must still explain its decision with reference to substantial evidence on the record. *Id.* at 9–10.

### b. Commerce's Valuation of Carbonized Materials Is Unsupported by Substantial Evidence

The court finds that Commerce's selection of Malaysian data for HS 4402.90.1000 to value carbonized material is unsupported by substantial evidence and remands the selection to the agency for further explanation or reconsideration. In particular, the agency's choice of a specific subcategory over a basket category in the valuation of carbonized material is not supported by Commerce's explanation.

While Commerce found it "clear that Carbon Activated's suppliers did not purchase carbonized material that was made from wood or nut charcoal so as to merit the inclusion of HS 4402.90.9000, 'other wood charcoal,' as part of the [surrogate value] valuation," Commerce made no analogous finding as to whether Carbon Activated's suppliers purchased carbonized material made from coconut shell charcoal. I&D Mem. at 43. Thus, the problem Commerce identified with respect to wood-based charcoal also appears to apply to coconut shell charcoal. Absent evidence that Respondents used coconut shell charcoal, Commerce's selection of one subheading (coconut shell charcoal) over another (other wood charcoal) is unsupported by substantial evidence and reasoned explanation.

Commerce's reliance on its findings in AR5 is unavailing because Commerce did not explain the relevance of that finding to Commerce's determination in this review. *See id.* As noted in *Qingdao*, "[e]ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." 766 F.3d at 1387; *see also Jiaxing II*, 822 F.3d at 1299 (quoting *Qingdao*, 766 F.3d at 1387). AR5 involved a specific type of activated carbon that could not have been produced using wood charcoal. *See* AR5 I&D Mem. at 36. Commerce has not established or indicated that such is the case in the present review.

Commerce is within its discretion to choose among imperfect datasets; however, Commerce's decision-making must take into account the facts on the record and reflect

a well-reasoned application of its methodology to the situation.[8]   *See Seah Steel Vina Corp. v. United States*, 41 CIT __, __, 269 F. Supp. 3d 1335, 1344 (2017); *Tr. Chem Co. v. United States*, 35 CIT 1012, 1017, 791 F. Supp. 2d 1257, 1263 (2011).  Here, Commerce has failed to explain its choice between two imperfect datasets and the court remands that selection for further explanation or reconsideration.

## VII.    Financial Ratios

Commerce selected the 2018 financial statements of "Bravo Green, a Malaysian producer of granulated carbon and steam activated carbon," to determine the surrogate financial ratios.  I&D Mem. at 32–33.  In addition to valuing the factors of production, Commerce is required to add an amount for other expenses, including profit, using surrogate financial ratios.  *See* 19 C.F.R. § 351.408(c)(4); *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010); *TT Int'l v. United States*, 44 CIT __, __, 439 F. Supp. 3d 1370, 1382 (2020).

Respondents advocated for the use of 2018 financial statements from either Joint Stock Company Sorbent ("JSC Sorbent"), a Russian producer of respiratory personal protective equipment, activated carbons, coagulants, and water treatment systems, or S.C. Romcarbon S.A. ("Romcarbon"), a Romanian producer of filters, polyethylene packaging, charcoal, and other chemical products.  I&D Mem. at 30, 33.  Respondents

---

[8] Plaintiffs contend that record evidence established the comparability of HS 4402.90.9000, "other wood charcoal," to coal-based carbonized materials, suggesting that HS 4402.90.9000 should have been used in lieu of HS 4402.90.1000.  *See* MJAR at 18–19.  On remand, Commerce should address the relevance of such evidence to its surrogate value selection.

argued that JSC Sorbent's 2018 financial statements were from a significant producer of

comparable merchandise, were contemporaneous with the period of review, and better

disaggregated the company's costs. *Id.* at 30. Respondents also contended that

Romcarbon's financial statements met all of the criteria for selection of its financial

ratios. *Id.*

Commerce selected Bravo Green's 2018 financial statements based on its

preference for using a financial statement from the primary surrogate country unless

such data is unavailable or unreliable. *Id.* at 31–32. Commerce emphasized its

preference for using contemporaneous statements from profitable companies that are

not distorted or otherwise unreliable, and that do not indicate that the company received

subsidies. *Id.* at 32. These considerations led the agency to select Bravo Green's 2018

statements, rather than any of the three Malaysian financial statements from 2017 that

had been used for the *Preliminary Results* or the Russian and Romanian alternatives

argued for by Respondents. *Id.* at 33–34. Commerce acknowledged, however, that

Bravo Green's financial statements were "not as detailed as Commerce prefers." *Id.* at

33.

### a. Parties' Contentions

Plaintiffs contend that Bravo Green's 2018 financial statements were

insufficiently disaggregated to be used for calculating financial ratios. MJAR at 38–42.

Plaintiffs indicate that these statements do not itemize raw materials, labor, or energy

costs but instead "itemize a basket category" titled "Cost of sales," which Plaintiffs

assert could have included a portion of manufacturing overhead and therefore have

distorted the profit ratios Commerce used.  *Id.* at 38–39; Pls.' Reply at 21.  Plaintiffs

argue that JSC Sorbent's 2018 financial ratios should have been used because they

separately itemized raw materials, labor, and energy.  MJAR at 42.  In the alternative,

Plaintiffs argue that the financial statements of Romcarbon are preferable to Bravo

Green's because they included breakouts for all cost elements, and Romania, while not

on the OP list, was economically comparable to China.  *Id.* at 44–46.

      The Government contends that Bravo Green's 2018 financial statements met

Commerce's selection criteria and were sufficient to calculate the financial ratios.  Def.'s

Resp. at 33–34.  The Government argues that the burden is on Plaintiffs to demonstrate

the unreliability or unavailability of financial statements from the primary surrogate

country and Plaintiffs have not made that showing here.  *Id.* at 34.

      In response to the Government's argument that Commerce's broad discretion

justifies the choice of Bravo Green over JSC Sorbent or Romcarbon, Plaintiffs note that

this is an insufficient explanation when there are such "tell-tale data flaws resulting in

distorted ratios" from Commerce's chosen financial statements.  Pls.' Reply at 21.

Plaintiffs also assert that "Commerce resorted to a disjunctive analysis—selecting

qualitatively inferior and distorted Bravo [Green] statements based simply on its single

surrogate country preference, entirely bypassing the qualitatively superior alternatives

from Russia and Romania."  *Id.* at 22 (citing *CP Kelco US, Inc. v. United States*, Slip

Op. 16–36, 2016 WL 1403657, at *2 (CIT Apr. 8, 2016)).

### b. Commerce's Choice of Bravo Green's 2018 Financial Statements is not Supported by Substantial Evidence

Commerce explained that, of the Malaysian financial statements, four were "from producers of identical or comparable merchandise."  I&D Mem. at 33.  Commerce then considered whether to use all four of them—three from 2017 and one from 2018—and determined to use only Bravo Green's 2018 financial statements because this was the only option that was "contemporaneous with the POR and reflect[ed] the experience of a producer of merchandise identical to the subject merchandise."  *Id.* at 34.  The agency acknowledged that it generally prefers to use multiple companies' financial statements where practicable, but explained that in this case it prioritized contemporaneity and therefore narrowed its selection to the 2018 Bravo Green statements.  *Id.*

Commerce's choice of Bravo Green's 2018 financial statements over the non-Malaysian alternatives was conclusory, however.  Commerce itself acknowledged that Bravo Green's 2018 statements were "not as detailed as Commerce prefers," I&D Mem. at 33, but did not explain why the less-than-ideal Bravo Green statements were better than the alternatives proposed by Respondents.  *See Mid Continent Steel & Wire, Inc. v. United States*, 45 CIT __, 551 F. Supp. 3d 1360 (2021) (remanding for failure to fully compare two imperfect sets of financial statements for calculation of surrogate value profit); *CP Kelco US, Inc.*, 2016 WL 1403657, at *2;[9] *Catfish Farmers of Am. v. United*

---

[9] A subsequent appeal from this case held that if Commerce made a specific finding that certain financial statements were unusable, then the agency was not required to compare side-by-side the different options on the record.  *CP Kelco US Inc. v. United States*, 949 F.3d 1348, 1359 (Fed. Cir. 2020).  That is not the case here, where

*States*, 37 CIT 717, 742 (2013).  Commerce rejected the non-Malaysian data without considering its potential merits, in favor of data from the primary surrogate country—even though the data from the primary surrogate country was less disaggregated and detailed than preferred.  *See* I&D Mem. at 33.  The agency's entire answer to Respondents' argument that JSC Sorbent or Romcarbon's statements should be used was: "We disagree. The record contains five financial statements from the primary surrogate country, Malaysia.  Of the five financial statements, four are from producers of identical or comparable merchandise . . . ."  It appears that Commerce did not consider JSC Sorbent or Romcarbon for the sole reason that they were not from Malaysia but did not explain why association with the primary surrogate country outweighed other considerations or criteria.

The court remands this issue to Commerce.  In so doing, the court does not require Commerce to choose any particular financial statement or reject Bravo Green's 2018 financial statements.  Commerce must, however, fairly weigh the available options and explain its decision in light of its selection criteria, addressing any shortcomings.

---

Commerce merely found that Bravo Green's financial statements were preferable, not that the others were unusable.

Court No. 21-00131                                                    Page 41

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Results* are sustained with respect to the

selection of surrogate values for bituminous coal, anthracite coal, hydrogen chloride,

sodium hydroxide, and steam; it is further

**ORDERED** that Commerce's *Final Results* are remanded for reconsideration or

further explanation with respect to the selection of the surrogate value for carbonized

materials and the financial statement selection for determining surrogate financial ratios;

it is further

**ORDERED** that Commerce shall file its remand redetermination on or before

November 7, 2022; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule

56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 4000

words.

/s/      Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: August 8, 2022
       New York, New York

**Appx41**

<u>Import Administration Policy Bulletin</u>

Number: 04.1

Topic: Non-Market Economy Surrogate Country Selection Process

Approved: _____

       James Jochum
       Assistant Secretary
         for Import Administration


_____

Date

<u>Statement of Issue</u>

This policy bulletin provides guidance regarding the Department's selection of surrogate market economy countries in non-market economy ("NME") cases.

<u>Background</u>

The statute provides broad discretion in the selection of surrogate market economy countries to value NME factors of production. In particular, section 773(c)(1)(B) of the Act reads:

> ...the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

Section 773(c)(4) of the Act adds:

The administering authority shall utilize *to the extent possible* ... prices ... in one or more market economy countries that are -

> 1. at a level of economic development comparable to that of the nonmarket economy country, and

> 2. a significant producer of comparable merchandise.

The terms "comparable level of economic development," "comparable merchandise," and "significant producer" are not defined in the statute. However, the Department's regulations attempt to clarify the statute's general guidance regarding surrogate country selection. In determining economic comparability, section 351.408 of the regulations places primary emphasis on per capita income, although other information can be considered. Some clarification is also provided in the Conference Report to the 1988 Omnibus Trade and Competitiveness Act, which added to the statute the current NME provisions and states that "significant producer" includes any country that is a "significant net exporter."[(1)] Section 351.408 of the regulations also makes clear that the relative weight attached to each of the two selection criteria, described above, is unspecified because the relative importance that the Department attaches to each will necessarily vary depending on the specific facts in each case.

The Conference Report also states that the Department should seek to use, if possible, data (in the surrogate market economy country) that reflect levels of technology and production volumes that are similar to the producers under investigation.

<u>Statement of Policy</u>

**Appx42**

In each NME investigation and review, the team considers potential surrogate countries in terms of their economic comparability to the NME country, and whether they are significant producers of comparable merchandise. The team then designates one country as the primary surrogate in a memo to the file, which explains how that country satisfies the statutory selection criteria. The memo must give substantive reasons on the record for why it deems the country selected to be a "significant producer" of comparable merchandise. It must include more than mere assertions, and must separately address the significant producer and comparable merchandise requirements. If one or both of the statutory criteria cannot be met, the memo should explain why this is the case, and why the particular country was selected as the primary surrogate.

The statute does not require that the Department use a surrogate country that is at a level of economic development *most* comparable to the NME country and that is the *most* significant producer of comparable merchandise. The statute requires only that the Department use a surrogate market economy country that is at a level of economic development comparable to that of the NME country and that is a significant producer of comparable merchandise. Even these requirements are not binding, as the statute requires that they be met *only to the extent possible*. Accordingly, the Department has adopted the following approach of sequential consideration of the statutory elements.[2]

*Economic Comparability*

First, early in a proceeding, the operations team sends the Office of Policy ("OP") a written request for a list of potential surrogate countries. In response, OP provides a list of potential surrogate countries that are at a comparable level of economic development to the NME country.[3] OP determines economic comparability on the basis of per capita gross national income, as reported in the most current annual issue of the World Development Report (The World Bank).[4] The surrogate countries on the list are not ranked and should be considered equivalent in terms of economic comparability.[5] Both the team's written request and OP's response should be made available to interested parties by being placed on the record of the proceeding.

*Comparable Merchandise*

Second, the operations team identifies those countries with producers of comparable merchandise among the potential surrogates on OP's list. As noted above, "comparable merchandise" is not defined in the statute or the regulations, since it is best determined on a case-by-case basis. Even so, there are some basic rules that every team should follow. In all cases, if identical merchandise is produced,[6] the country qualifies as a producer of comparable merchandise. In cases where identical merchandise is not produced, the team must determine if other merchandise that is comparable is produced. How the team does this depends on the subject merchandise. For example, in some cases, *e.g.*, steel and textiles, physical form and the extent of processing/finishing essentially distinguish different products. In such cases, consideration of major inputs often is not required, as it is normally sufficient for the team to identify comparable merchandise on the basis of physical differences in the merchandise and whether the product is one of low or high value-added. Thus, if circular steel pipe and tube were the subject merchandise, rectangular steel pipe and tube, hot-rolled steel sheet and plate, steel wire rod, steel wire rope, steel bar, and structurals, all of which are low value-added products of roughly similar form (made by combining iron, energy, and further processing), would constitute comparable merchandise.

A similar approach can also be used in the case of industrial commodity chemicals and when the subject merchandise is part of a spectrum of light manufactured products, *e.g.*, paper clips, fireworks, wax candles, cased pencils, toys, shoes, gift boxes, folding metal tables and

**Appx43**

chairs. In these cases, the large number, and generic nature, of the inputs makes input matching very complicated. Therefore, it may make more sense for the operations team to consider the physical characteristics of the merchandise, and the extent of further value-added process in identifying comparable merchandise.

In other cases, however, where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate.

*Significant Producer*

Third, the operations team determines whether any of the countries which produce comparable merchandise are "significant" producers of that comparable merchandise. The extent to which a country is a *significant* producer should not be judged against the NME country's production level or the comparative production of the five or six countries on OP's surrogate country list. Instead, a judgement should be made consistent with the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics). Since these characteristics are specific to the merchandise in question, the standard for "significant producer" will vary from case to case. For example, if there are just three producers of comparable merchandise in the world, then arguably any commercially meaningful production is significant. Intermittent production, however, would not be significant. If there are ten large producers and a variety of small producers, "significant producer" could be interpreted to mean one of the top ten. If, in the example above, there is also a middle-size group of producers, then "significant producer" could be interpreted as one of the top ten or middle group. In another case, there may not be adequate data available from major producing countries. In such a case, "significant producer" could mean a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers. Because the meaning of "significant producer" can differ significantly from case to case, fixed standards such as "one of the top five producers" have not been adopted. For example, South Korea is, by almost any measure, a significant producer of steel, even though in 2001 it was not one of the top five producers overall.

Given that the decision as to what constitutes "significant production" in a particular case depends on available (often scarce) data, the specific criteria and supporting factual information used to determine whether a potential surrogate country is a significant producer is left to the discretion of the operations team. The operations team may consult with U.S. Government experts who have made their own assessments of the world's producers of comparable merchandise or who can supply the team with country production or trade data. Other possible sources of data supporting the "significant production" decision may include non-governmental organizations or international trade/industry association publications and similar sources.

Sometimes, none of the countries identified as being economically comparable are a significant producer of comparable merchandise, as defined above. Or, it may happen that some countries meet both criteria, but sufficient data (with respect to quantity and quality) are not available to enable the Department to use any of those countries as the primary surrogate. In such cases, the team should request a second list of potential surrogate countries from OP, and then follow the country selection procedure described above.

*Data Considerations*

**Appx44**

Fourth, if more than one country has survived the selection process to this point, the country with the best factors data is selected as the primary surrogate country.[7] Even if no issues arise regarding economic comparability and significant production, data quality is a critical consideration affecting surrogate country selection. After all, a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable. Limited data availability sometimes is the reason why the team will "go off" the OP list in search of a viable primary surrogate country.

In assessing data and data sources, it is the Department's stated practice to use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data.

*Exceptions to the Sequencing Procedure*

Occasionally, there are also cases in which it is more appropriate for the team to address economic comparability only *after* the significant producer of comparable merchandise requirement is met. Cases where particular emphasis on "significant producer of comparable merchandise" is warranted are generally those that involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production), *e.g.*, crawfish, which is produced by only a few countries. See *Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Preliminary Results of Antidumping Duty Administrative Review*, 67 FR 63877 (October 16, 2002). Particular emphasis on "significant producer of comparable merchandise" is also generally warranted where major inputs are not widely traded internationally, *e.g.*, electricity, which is used intensively in the production of magnesium. See *Notice of Preliminary Results of Antidumping Duty Administrative Review: Pure Magnesium from the Russian Federation*, 59 FR 55427 (November 7, 1994).[8]

The significant producer requirement is particularly important in these cases because the Department wants to avoid selecting a surrogate country in which the relative scarcity (either through domestic sources or through imports) of a major non- or little-traded input precludes the country from being a competitive producer of comparable merchandise. For example, in the *Notice of Preliminary Determination of Sales at Less Than Fair Value: Urea Ammonium Nitrate Solutions From the Russian Federation*, 67 FR 62008 (October 3, 2002), the Department placed particular emphasis on the significant producer requirement in light of the gas-intensive nature of urea ammonium nitrate production, and the fact that natural gas is not commonly imported into the countries being considered as surrogate countries.

In cases in which the significant producer of comparable merchandise criterion is particularly important, the team should first ensure, on the basis of in-house research (including possible communications with other U.S. Government experts) and any interested party comments, that the significant producer of comparable merchandise requirement is met. Only after this requirement is met should the team consider economic comparability. If the competing significant producer countries are at disparate levels of economic development, and the necessary factors data is available in these countries, then the team should use the country closest to the NME country in terms of per capita GNI. On the other hand, if the significant producer countries are at closely similar levels of economic development, as are the countries on a surrogate country selection list, the team should use the country with the best factor price data. Where only one country satisfies the significant producer and data requirements, that country will normally be used.

**Appx45**

1. A net exporter is defined as a country whose exports exceed its imports.

2. An alternative approach that the Department has considered, but rejected as administratively unfeasible would be to assess the extent to which each country "grades out" *overall* with respect to the two statutory criteria. For example, each country would be assessed with respect to economic comparability and the extent to which it was a significant producer of comparable merchandise. These two grades would then be weighted together to arrive at a composite grade for each country. Teams would then have to combine with this composite grade an assessment or grading of factors data quality and completeness in the country. The best surrogate would then be selected on the basis of this overall grade.

3. OP excludes non-market economy countries from the list of potential surrogate countries, and also excludes countries that technically are presumed to be market economies, but which in OP's judgement are unsuitable sources for factor values (*e.g.*, Cuba).

4. In the past, the OP memos also referenced growth rates and the national distribution of labor between the agriculture and non-agriculture sectors. However, since these factors are not determinative in the selection of an economically comparable surrogate country, they will no longer be included in future OP memos.

5. IA's current practice reflects in large part the fact that the statute does not require the Department to use a surrogate country that is at a level of economic development *most* comparable to the NME country.

6. If considering a producer of identical merchandise leads to data difficulties, the operations team may consider countries that produce a broader category of reasonably comparable merchandise.

7. An additional surrogate is sometimes used to fill factor price "holes" in the primary surrogate.

8. For example, concerns were raised in *Pure Magnesium from the Russian Federation* about the electricity-intensive nature of magnesium production and the fact that electricity, as a general rule, is not significantly traded into potential surrogate countries. These concerns made clear the importance, from an electricity valuation standpoint, of selecting a surrogate that was a significant producer of magnesium or some other comparable electricity-intensive product. However, none of the countries on OP's initial surrogate country list produced "comparable merchandise," even after that had been more broadly defined. (After consulting with experts at the U.S. Bureau of Mines and the DOC Trade Development Metals Division, the Department concluded in that case that "comparable merchandise" comprised magnesium and aluminum because both are "light metals" in terms of weight, are electricity-intensive products, are produced using an electrolytic process, and share some common end-uses. The Department, with the help of the U.S. Bureau of Mines, identified four significant producers of such "comparable merchandise," defining significant production as production exceeding 100,000 metric tons per year. Venezuela, Argentina, Brazil and South Africa were found to be "significant producers" of either magnesium or aluminum. Because only Brazil produced magnesium, the Department selected Brazil as the primary surrogate country.

**Appx47**

Slip Op. 23-66

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., ET AL., | |
| Plaintiffs, | |
| v. | Before: Mark A. Barnett, Chief Judge |
| UNITED STATES, | Court No. 21-00131 |
| Defendant, | |
| and | |
| CALGON CARBON CORPORATION AND CABOT NORIT AMERICAS, INC., | |
| Defendant-Intervenors. | |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's remand results in the twelfth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.]

Dated: April 28, 2023

<u>Francis J. Sailer</u>, <u>Dharmendra N. Choudhary</u>, and <u>Jordan C. Kahn</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for Plaintiffs.

<u>Antonia R. Soares</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Claudia Burke</u>, Assistant Director. Of counsel on the brief was <u>Ashlande Gelin</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

<u>John M. Herrmann</u>, <u>R. Alan Luberda</u>, <u>Melissa M. Brewer</u>, and <u>Julia A. Kuelzow</u>, Kelley Drye & Warren LLP, of Washington DC, for Defendant Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc.

Barnett, Chief Judge:  This matter is before the court following the U.S.

Department of Commerce's ("Commerce" or "the agency") redetermination upon

remand in this case.  *See* Final Results of Redetermination Pursuant to Ct. Remand

("Remand Results"), ECF No. 50-1.  Plaintiffs[1] (referred to in the administrative

proceeding as "Respondents") commenced this case challenging aspects of

Commerce's final results in the twelfth administrative review ("AR12") of the

antidumping duty order on certain activated carbon from the People's Republic of China

("China") for the period of review April 1, 2018, through March 31, 2019.  *See Certain*

*Activated Carbon From the People's Republic of China*, 86 Fed. Reg. 10,539 (Dep't

Commerce Feb. 22, 2021) (final results of antidumping duty admin. review, final

determination of no shipments, and final rescission of admin. review, in part; 2018-

2019) ("*Final Results*"), ECF No. 32-3, and accompanying Issues and Decision Mem.,

A-570-904 (Feb. 12, 2021) ("I&D Mem."), ECF No. 32-2.[2]  Plaintiffs challenged

Commerce's selection of surrogate values for bituminous coal, anthracite coal,

hydrochloric acid, carbonized materials, caustic soda, and steam, along with the

---

[1] The Plaintiffs are Carbon Activated Tianjin Co., Ltd., Carbon Activated Corporation,
Datong Juqiang Activated Carbon Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Datong
Municipal Yunguang Activated Carbon Co., Ltd., and Beijing Pacific Activated Carbon
Products Co., Ltd.

[2] The administrative record filed in connection with the Remand Results is divided into a
Public Remand Record ("PRR"), ECF No. 51-2, and a Confidential Remand Record
("CRR"), ECF No. 51-3.  Parties filed joint appendices containing record documents
cited in their briefs.  *See* Public Remand J.A., ECF No. 58; Confid. Remand J.A.
("CRJA"), ECF No. 57.  Citations are to the CRJA unless stated otherwise.

selection of surrogate financial ratios.  *See Carbon Activated Tianjin Co. v. United States* ("*Carbon Activated I*"), 46 CIT __, __, 586 F. Supp. 3d 1360, 1364 (2022).[3]

    In *Carbon Activated I*, the court sustained in part and remanded in part the *Final Results*.  *Id*. at 1381–82.  The court remanded the *Final Results* to Commerce for reconsideration or further explanation of its selection of the surrogate value for carbonized materials and its selection of financial statements for determining surrogate financial ratios.  *Id*. at 1382.  On November 17, 2022, Commerce filed its Remand Results.  Therein, Commerce further explained its selection of a surrogate value for carbonized materials and selection of surrogate financial statements.  *See* Remand Results at 3–12.

    Plaintiffs filed comments opposing Commerce's selection of Malaysian import data under Harmonized System ("HS") subheading 4402.90.1000 as the surrogate value for carbonized materials and Commerce's calculation of surrogate financial ratios using the 2018 financial statements of the Malaysian company, Bravo Green Sdn. Bhd. ("Bravo Green").  *See* Pls.' Cmts. in Opp'n to Remand Redetermination ("Pls.' Opp'n Cmts."), ECF No. 54.  Defendant United States ("the Government") and Defendant-Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc. (together, "Calgon") filed comments in support of the Remand Results.  *See* Def.'s Reply in Supp. of the Dep't of Commerce's Remand Redetermination ("Def.'s Supp. Cmts."), ECF No.

---

[3] The court's opinion in *Carbon Activated I* presents background information on this case, familiarity with which is presumed.

56; Def.-Ints.' Cmts. in Supp. of Remand Redetermination ("Calgon's Supp. Cmts."),

ECF No. 55.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018)[4] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence

and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

**I.    Legal Framework**

An antidumping duty is "the amount by which the normal value exceeds the

export price (or the constructed export price) for the merchandise," 19 U.S.C. § 1673.

As discussed in *Carbon Activated I*, 586 F. Supp. 3d at 1365–67, when an antidumping

duty proceeding involves a nonmarket economy country, Commerce determines normal

value by valuing the factors of production[5] in a surrogate country, *see* 19 U.S.C. §

1677b(c)(1), and those values are referred to as "surrogate values."   In selecting

surrogate values, Commerce must, "to the extent possible," use "the best available

information" from a market economy country or countries that are economically

---

[4] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise specified.
[5] The factors of production include but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

comparable to the nonmarket economy country and are "significant producers of comparable merchandise." *Id*. § 1677b(c)(1), (4).

Commerce generally values all factors of production in a single surrogate country, referred to as the "primary surrogate country." *See* 19 C.F.R. § 351.408(c)(2) (excepting labor); *Jiaxing Brother Fastener Co. v. United States* ("*Jiaxing II*"), 822 F.3d 1289, 1294 & n.3 (Fed. Cir. 2016). Commerce, in selecting surrogate values, "generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Jiaxing II*, 822 F.3d at 1293 (citing *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014)); *see also* 19 C.F.R. § 351.408(c)(1), (4). Commerce will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable." *Jiaxing Brother Fastener Co. v. United States*, 38 CIT 1404, 1412, 11 F. Supp. 3d 1326, 1332–33 (2014) (citations omitted), *aff'd*, *Jiaxing II*, 822 F.3d 1289.

## II. Surrogate Value for Carbonized Materials

### a. Background

For the *Final Results*, Commerce valued coal-based carbonized material using Malaysian import data under HS 4402.90.1000, which covers "coconut shell charcoal." I&D Mem. at 43. Commerce selected coconut shell charcoal after finding that Respondents' proposed surrogate, HS 4402.90, which covers "wood charcoal (including shell or nut charcoal), excluding that of bamboo," was not an appropriate surrogate. *Id.* Commerce explained that HS 4402.90, a basket category inclusive of both coconut shell

charcoal and HS 4402.90.9000, covering "other wood charcoal," was not the best

information available on the record to value carbonized material because "there [was]

no evidence on the record indicating that [Respondents] produced subject merchandise

from wood, nuts, or any other non-coal charcoal." *Id.*

    In *Carbon Activated I*, the court remanded Commerce's selection because the

record lacked evidence that Respondents used coconut shell charcoal in the

manufacture of the subject merchandise and, thus, the agency's selection between two

imperfect datasets was unsupported by substantial evidence. 586 F. Supp. 3d at 1379.

    In the draft redetermination, Commerce valued carbonized materials using

Malaysian imports under HS 4402.90, finding that the record contained no evidence that

Respondents purchased or used coconut shell charcoal to produce activated carbon

exported to the United States, and that the record did not demonstrate whether coconut

shell charcoal or wood charcoal was more similar to coal-based carbonized material.

Draft Results of Redetermination Pursuant to Ct. Remand (Sept. 29, 2022) at 3–5, PRR

1, CRJA Tab 1.

    Commerce reversed course in the Remand Results, selecting HS 4402.90.1000

as the best available information to value coal-based carbonized material, as it had for

the *Final Results*. Remand Results at 3, 14. Commerce explained that, in this

administrative review, there was no evidence that wood-based carbonized materials

had been used to produce activated carbon; however, historically, coconut shell

charcoal had been used to manufacture activated carbon. *Id*. at 5. Commerce further

explained that coconut shell charcoal shares similarities with coal-based carbonized

material.  *Id*.  Commerce also noted that Respondents produced only steam activated carbon whereas wood charcoal is usually used to produce activated carbon through chemical activation.  *Id*. at 6–7.

### b.  Parties' Contentions

Plaintiffs contend that Commerce's selection of coconut shell charcoal to value carbonized material is unsupported by substantial evidence.  Pls.' Opp'n Cmts. at 1–5.  Plaintiffs argue that the record does not support Commerce's finding that coconut shell charcoal has been used to produce activated carbon.  *See id*. at 2–3.  Plaintiffs argue there was no evidence demonstrating that coconut shell charcoal was more comparable to coal-based carbonized material than wood charcoal, *id*. at 3, and that precedent compels Commerce to select HS 4402.90 as the surrogate value, *id*. at 4–5.  Plaintiffs also contend that wood charcoal can be used to manufacture activated carbon through steam activation.  *Id*. at 5.[6]

Defendant contends that substantial evidence supports Commerce's selection of coconut shell charcoal as the surrogate value for carbonized material.  *See* Def.'s Supp. Cmts. at 3–7.  Defendant argues that because Respondents only reported the

---

[6] Plaintiffs also contend that pricing information on the record indicates that using coconut shell charcoal alone to value carbonized material would be "unrepresentative" and "yield[] a distorted [surrogate value]."  Pls.' Opp'n Cmts. at 4.  In the Remand Results, Commerce explained that "it is unclear how this information supports the use of a wood-based [surrogate value] without further evidence or explanation."  Remand Results at 15.  Even if the price of coal-based activated carbon overlaps with coconut shell-based activated carbon and wood-based activated carbon, it does not detract from Commerce's selection of coconut shell charcoal based on the activation process Respondents use to produce the subject merchandise and Commerce's historical practice of using coconut shell charcoal as a surrogate value.

production of steam activated carbon, and because chemically activated carbon is generally made using wood, wood-based carbonized material was not the best information to use as a surrogate value.  *Id*. at 4–6.

Calgon contends that the underlying record and Commerce's findings in prior reviews support Commerce's determination that coconut shell charcoal shares many similarities with coal-based carbonized material and is therefore an appropriate surrogate value.  *See* Calgon's Supp. Cmts. at 2–7.

### c.  Analysis

The court finds that Commerce's selection of Malaysian data for HS 4402.90.1000 to value carbonized material is supported by substantial evidence.  While a reasonable case might also be made for the use of Malaysian HS 4402.90, the basket category that includes other wood charcoal, the court is mindful of the standard of review with respect to challenges to Commerce's selection of surrogate values in cases involving nonmarket economy countries.  In particular, Commerce has significant discretion to choose "the best available information" to value the factors of production, so long as it does so in conformity with the substantial evidence standard.  *See QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  Commerce must articulate "a rational and reasonable relationship" between the surrogate value and "the factor of production it represents."  *Globe Metallurgical, Inc. v. United States*, 28 CIT 1608, 1622, 350 F. Supp. 2d 1148, 1160 (2004) (citing *Olympia Indus., Inc. v. United States*, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1001 (1998)).  Consistent with the court's standard of review and the discretionary, fact-specific nature of Commerce's

determination, the role of the court is not to determine "whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing II*, 822 F.3d at 1300–01.

On remand, Commerce selected between two alternative data points to value carbonized material—Malaysian HS 4402.90, the basket category that includes other wood charcoal, and Malaysian HS 4402.90.1000, a more precise category within the basket that is limited to coconut shell charcoal. Remand Results at 2–3. In evaluating those two categories, Commerce explained that chemically activated carbon is generally made using wood-based carbonized materials. *See id*. at 7. While this does not mean that steam activated carbon, the subject merchandise produced by Plaintiffs, is not or cannot be produced with wood-based charcoal, Commerce's analysis did not stop there.

In choosing between the two possible surrogate values, Commerce considered the history of this antidumping duty order. *Id*. at 5. Specifically, Commerce explained that there is "a long, demonstrable history in this proceeding of using coconut-shell carbmat[7] in the production of the subject merchandise, unlike wood carbmat, which has never been used to produce the subject merchandise." *Id*. (footnote with citations omitted).[8] While it is true that each review is separate and based on the record

---

[7] "Carbmat" is shorthand for "carbonized material."
[8] In light of the different possible production processes, this finding is not inconsistent with Commerce's prior recognition that wood-based charcoal may be used to produce

developed before the agency in that review, that legal truism does not prevent

Commerce from acting in accord with prior reviews when the record of the present

review does not contain new or additional facts warranting a departure from the

agency's prior practice. To that end, Commerce concluded that Respondents "have not

provided any new evidence in this review to warrant a departure from Commerce's

practice of selecting coconut-shell charcoal to value [Respondents'] carbmat in this

proceeding," *id.* at 7 (citing *Qingdao*, 766 F.3d at 1386), and Plaintiffs do not identify any

such new evidence to the court.

Accordingly, Commerce has supported its surrogate value selection with

substantial evidence such that a reasonable mind could find that the agency selected

the best information available.

### III. Surrogate Financial Statements

#### a. Background

For the *Final Results*, Commerce selected the 2018 financial statements of Bravo

Green, a Malaysian producer of granulated carbon and steam activated carbon, to

calculate the surrogate financial ratios. I&D Mem. at 31–33. In addition to the 2018

Bravo Green financial statements, the record contained seven other sets of financial

---

activated carbon. *See* Issues and Decision Mem. for Certain Activated Carbon from
China, A-570-904, (Nov. 20, 2013), at 36 ("Petitioners correctly state that activated
carbon may be manufactured from wood or nut charcoal in addition to coal."),
https://access.trade.gov/Resources/frn/summary/prc/2013-28359-1.pdf (last visited April
28, 2023); *see also Jacobi Carbons AB v. United States*, 619 Fed. App'x. 992, 999
(Fed. Cir. 2015) ("Wood charcoal is also a type of charcoal and can also be used to
create [activated carbon].").

statements, including the 2018 financial statements of Joint Stock Company Sorbent ("JSC Sorbent"), "a Russian producer of respiratory personal protective equipment, activated carbons, coagulants, and water treatment systems," and S.C. Romcarbon S.A. ("Romcarbon"), "a Romanian producer of filters, polyethylene packaging, charcoal and other chemical products." *Id*. at 32–33.

The court found Commerce's selection of Bravo Green's 2018 financial statements to be "conclusory" because the agency failed to explain why the selected financial statements were preferable to those of JSC Sorbent and Romcarbon, despite the agency's acknowledgement that the 2018 Bravo Green financial statements were "not as detailed as [the agency] prefer[ed]." *Carbon Activated I*, 586 F. Supp. 3d at 1381 (quoting I&D Mem. at 33). The court found that Commerce failed to "explain why [Bravo Green's] association with the primary surrogate country outweighed other considerations or criteria" and remanded to Commerce to "fairly weigh the available options [for financial statements] and explain its decision in light of its selection criteria, addressing any shortcomings." *Id*.

On remand, Commerce again selected the 2018 financial statements of Bravo Green to calculate the surrogate financial ratios. Remand Results at 9, 28. Commerce distinguished the business operations and production experiences of Bravo Green from those of JSC Sorbent and Romcarbon. *Id*. at 10–11. Commerce found that JSC Sorbent produces numerous other types of merchandise and Commerce explained it was unable to determine what proportion of the company's production activity was related to activated carbon. *Id*. For that reason, Commerce found that it was unable to

determine whether JSC Sorbent's production experience was similar to that of Respondents or Bravo Green.  *Id*. at 10–11, 21–22, 25–26.

With respect to Romcarbon, Commerce noted that the company's production of activated carbon was carried out exclusively in one discrete profit center accounting for only 1.34 percent of Romcarbon's 2018 sales.  *Id*. at 11, 21, 26.  Furthermore, that profit center produced protective equipment in addition to activated carbon, such that Commerce inferred that Romcarbon's sales of activated carbon represented an even smaller percentage of its total sales.  *Id*. at 11.  In contrast, Commerce noted, one hundred percent of Bravo Green's revenue was derived from the production and sale of activated carbon, similar to Respondents' operations and sales.  *Id*.

Commerce noted that "there [was] no information indicating that [JSC Sorbent] is a producer of *steam* activated carbon" and that there was no information as to whether the production process for JSC Sorbent's coagulants was similar to that of steam activated carbon or whether those coagulants were comparable to steam activated carbon.  *Id*. at 23–24.  Commerce also noted that the record contained no information regarding the production process of Romcarbon's automotive and industrial filters or whether these products shared any similarities with steam activated carbon, nor did the record indicate any similarities between steam activated carbon and certain plastic products made by Romcarbon.  *Id*. at 24–25.

Commerce found that the Bravo Green financial statements "provide[d] a cost of sales and depreciation expenses related to equipment and machinery from which to

derive an overhead surrogate ratio, SG&A[9] expenses from which to derive a surrogate SG&A ratio, and a profit from which to calculate a profit ratio." *Id.* at 20. While Commerce again acknowledged that the financial statements were not as detailed as the agency preferred, it concluded they were detailed enough and the best choice to calculate surrogate financial ratios. *Id.*

### b. Parties' Contentions

Plaintiffs contend that Commerce's selection of the Bravo Green financial statements is unsupported by substantial evidence. Pls.' Opp'n Cmts. at 5–10. Plaintiffs contend that Commerce's rejection of the JSC Sorbent and Romcarbon financial statements based on these entities' unknown or relatively low proportion of sales of activated carbon in relation to overall sales "replaces longstanding Commerce practice requiring that surrogate companies produce only some proportion of identical/comparable merchandise with a rigid formula requiring an unspecified production level of the identical merchandise." *Id.* at 7.

Defendant and Calgon contend that substantial evidence supports Commerce's selection of the Bravo Green financial statements to calculate the surrogate financial ratios. *See* Def.'s Supp. Cmts. at 7–14; Calgon's Supp. Cmts. at 7–11.

### c. Analysis

In *Carbon Activated I*, the court found Commerce's selection of the 2018 Bravo Green financial statements over the financial statements of JSC Sorbent and

---

9 SG&A stands for "sales, general, and administrative."

Romcarbon to be "conclusory" because Commerce had failed to consider the potential

merits of the non-Malaysian data or explain why Commerce's preference to select data

from the primary surrogate country outweighed the shortcomings of the Bravo Green

data.  586 F. Supp. 3d at 1381.  In the Remand Results, Commerce has supported its

selection of the 2018 Bravo Green financial statements with substantial evidence.

On remand, Commerce compared the relative shortcomings of the 2018 Bravo

Green financial statements to those of the JSC Sorbent and Romcarbon financial

statements.  *See* Remand Results at 20–26.  Specifically, Commerce explained that

because Romcarbon's financial statements were not broken down by business units,

and because activated carbon accounted for only a small or unknown percentage of

Romcarbon's revenue, use of either of those financial statements would result in

surrogate financial ratios "largely unrelated to the production experience of

[Respondents] and thus introduce distortions in the margin calculations."  *Id*. at 21; *see*

*also id*. at 21–22 (noting "similar deficiencies" in JSC Sorbent's financial statements).

Furthermore, Commerce noted that the financial ratios submitted by Respondents

based on JSC Sorbent's financial statements did not capture JSC Sorbent's

administrative expenses and their use would thus be "inconsistent with Commerce's

well-established methodology for calculating the [financial] ratio."  *Id*. at 22; *see id*. at

21–22.  Finally, Commerce explained that the Bravo Green financial statements

represented the best available information because Romcarbon and JSC did not

produce only identical or comparable merchandise.  *Id*. at 23–25 (noting that the record

did not contain evidence indicating that JSC Sorbent or Romcarbon produced *steam*

activated carbon and that other products these entities produced were not comparable to activated carbon).

Plaintiffs rely on Commerce's determination in the investigation of certain steel nails from China ("*Steel Nails Investigation*") to argue that a potential surrogate's limited production of subject merchandise does not disqualify that surrogate from selection. *See* Pls.' Opp'n Cmts. at 8–9 (citing Issues and Decision Mem. for Certain Steel Nails from China ("Steel Nails Inv. I&D Mem.") at 36, A-570-909, (June 6, 2008), https://access.trade.gov/Resources/frn/summary/prc/E8-13474-1.pdf (last visited April 28, 2023)). While that may be true, in the *Steel Nails Investigation*, Commerce addressed the question of whether to combine the ratios of a producer of a small quantity of identical merchandise with the ratios of one or more producers of comparable merchandise. *See* Steel Nails Inv. I&D Mem. at 36. Commerce declined to do so on the basis that it would "dilute the extent to which the resulting ratios represent production of [subject merchandise]." *Id*. at 36. Here, the record indicates that Bravo Green manufactures only activated carbon, which is also true of Respondents. Remand Results at 26. Thus, selecting either JSC Sorbent's or Romcarbon's financial statements, or combining them with the Bravo Green financials, would dilute the extent to which the resulting financial ratios represent production of activated carbon. *See id*. at 26–27.[10]

---

[10] Plaintiffs also argue that Commerce misplaces reliance on *Chlorinated Isocyanurates from China*, and that this determination supports the use of JSC Sorbent's and Romcarbon's financial statements because both companies "produce some activated

Plaintiffs further contend that Commerce misplaces reliance on the second

administrative review of *Certain Steel Nails from China* ("*Steel Nails AR2*") to support its

selection of Bravo Green's financial statements.  *See* Pl.'s Opp'n Cmts. at 9–10.  In the

Remand Results, Commerce explained that, in cases where the record contained

detailed evidence of the relative amount of merchandise produced by a surrogate

company, the agency would "analyze a surrogate company's product mix to make a

determination of whether it is more reasonable to consider the company an 'identical'

producer . . . or a producer of comparable merchandise depending on the facts of the

case."  Remand Results at 23 (quoting Issues and Decision Mem. for Certain Steel

Nails from China, A-570-909, (Feb. 23, 2012) ("Steel Nails AR2 I&D Mem."), at 13–14

https://access.trade.gov/Resources/frn/summary/prc/2012-4877-1.pdf (last visited April

28, 2023)).  Plaintiffs argue that *Steel Nails AR2* precludes Commerce from rejecting

---

carbon."  Pls.' Opp'n Cmts. at 9.  In *Chlorinated Isocyanurates from China*, Commerce
selected the financial statements of a surrogate company whose sales of subject
merchandise accounted for less than ten percent of its overall revenue; however, in that
review, there were no more comparable surrogate financials available on the record.
Issues and Decision Mem. for Chlorinated Isocyanurates from China, A-570-898, (Nov.
10, 2010), ("Chlorinated Isocyanurates I&D Mem.") at 15–17,
https://access.trade.gov/Resources/frn/summary/prc/2010-29020-1.pdf (last visited April
28, 2023).  Moreover, Commerce ultimately selected one company over the other based
on suspected subsidization of the other potential surrogate.  *See id.* at 17.  Thus, that
determination does not stand for the proposition that Commerce must select the
financial statements of a company that produces "some" subject merchandise, but
instead reinforces that Commerce will select the best available information on each
individual record.  Commerce merely referenced the Chlorinated Isocyanurates Issues
and Decision Memorandum to explain its continued practiced "of finding the best
available information with respect to the valuation of surrogate financial ratios based on
similarities between . . . respondents' operations and [ ] surrogate financial compan[ies']
operations."  Remand Results at 26–27.

the JSC Sorbent or Romcarbon financial statements "without comparing their data quality against" Bravo Green's financial statements.  Pl.'s Opp'n Cmts. at 9.

Plaintiffs' argument is unavailing.  In *Certain Steel Nails from China*, the only contemporaneous financial statements on the record came from surrogate companies of comparable, not identical, merchandise.  *See* Steel Nails AR2 I&D Mem. at 12–14.  Here, as Commerce explained, Bravo Green produced *only* identical merchandise, while the record indicated that activated carbon represented only a small or unknown percentage of all merchandise produced by JSC Sorbent or Romcarbon.  Remand Results at 23–25.  Contrary to Plaintiffs' claims, Commerce *did* compare the data quality of Bravo Green's financial statements with those placed on the record by Respondents.  Although the Bravo Green financial statements were not as detailed as Romcarbon's or JSC Sorbent's financial statements, Commerce found that "any 'potential' distortions" caused by this lack of detail were not as significant as the distortions that would arise from the use of financial statements of companies whose production experience was largely unrelated to that of Respondents.  *See id*. at 20–22.

Nor does Plaintiffs' reliance on the tenth ("AR10") or eleventh ("AR11") administrative reviews of the antidumping duty order on certain activated carbon from China indicate that Commerce deviated from its prior selection of Romcarbon's financial statements "without explanation."  *See* Pls.' Opp'n Cmts. at 9–10 (arguing that the underlying facts of AR10 and AR11 are "identical for Romcarbon and similar for [JSC Sorbent]," and thus, Commerce needed to "provide a 'reasonable explanation'" for its deviation from selecting Romcarbon's financial statements).  In AR10, the court

sustained Commerce's selection of Romcarbon's financial statements, noting that the

petitioner had failed to "identify a standard for determining the reliability of financial

statements based on the level of production of the same or comparable merchandise"

and declined to "reweigh the evidence considered by Commerce." *Calgon Carbon*

*Corp. v. United States*, 44 CIT __, __, 443 F. Supp. 3d 1334, 1352 (2020).  In AR11,

Commerce selected Romcarbon's financial statements because other financial

statements on the record were either non-public, or "lack[ed] usable financial data"

because the statements did not break down the cost of raw materials and energy into

separate line items, Prelim. Decision Mem. for Certain Activated Carbon From China, A-

570-904 (June 10, 2019) at 16, https://access.trade.gov/Resources/frn/summary/prc/

2019-12616-1.pdf (last visited April 28, 2023) (unchanged in final issues and decision

memorandum), and the parties did not dispute Commerce's selection of Romcarbon's

financial statements, *see* Issues and Decision Mem. for Certain Activated Carbon from

China, A-570-904 (Dec. 11, 2019) at 20–21, https://access.trade.gov/Resources/frn/

summary/prc/2019-27134-1.pdf (last visited April 28, 2023).

  Unlike in AR10 and AR11, the record here contained publicly available financial

statements from a company in the primary surrogate country that produced identical

merchandise, and which did not show evidence of countervailing subsidies.  Remand

Results at 20.  Commerce found that the financial statements were "sufficiently detailed

to calculate surrogate financial ratios" because they included "cost of sales and

depreciation expenses . . . from which to derive an overhead surrogate ratio, SG&A

expenses from which to derive a surrogate SG&A ratio, and a profit from which to

calculate a profit ratio." *Id*. at 20.  Furthermore, to the extent that Plaintiffs argue that

Commerce must continue to select Romcarbon's financial statements because the

agency has done so in past reviews, this argument is mistaken.  "[E]ach administrative

review is a separate exercise of Commerce's authority that allows for different

conclusions based on different facts in the record," *Jiaxing II,* 822 F.3d at 1299 (quoting

*Qingdao*, 766 F.3d at 1387), and the financial statements placed on the record in this

review were not identical to those in AR10 or AR 11.

    In sum, although Commerce continues to acknowledge that the Bravo Green

financial statements are not as detailed as the agency prefers, *id*. at 10, 20,

Commerce's assessment of the financial statements shows that the agency sufficiently

considered and explained its selection of Bravo Green's financial statements as the best

available information on the record, *see Jiaxing II*, 822 F.3d at 1300–01.  Plaintiffs have

failed to show that the reasoning behind Commerce's selection was contrary to

established agency practice or that Commerce otherwise failed to account for evidence

that detracted from its choice.  Thus, the court refuses Plaintiffs' invitation to reweigh the

evidence considered by Commerce.

CONCLUSION

    For the foregoing reasons, the court will sustain Commerce's *Final Results* as

modified by the Remand Results.  Judgment will enter accordingly.

/s/    Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated:   April 28, 2023
      New York, New York

**Appx66**

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., ET AL., <br><br>          Plaintiffs, <br><br>          v. <br><br> UNITED STATES, <br><br>          Defendant, <br><br>          and <br><br> CALGON CARBON CORPORATION AND CABOT NORIT AMERICAS, INC., <br><br>          Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge <br> Court No. 21-00131 |

## <u>JUDGMENT</u>

This case having been duly submitted for decision, and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

**ORDERED** that the U.S. Department of Commerce's final results in the twelfth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China, *see Certain Activated Carbon From the People's Republic of China*, 86 Fed. Reg. 10,539 (Dep't Commerce Feb. 22, 2021) (final results of antidumping duty admin. review, final determination of no shipments, and final rescission of admin. review, in part; 2018-2019), as amended by the Final Results of Redetermination Pursuant to Court Remand, ECF No. 50-1, are **SUSTAINED**; and it is further

Court No. 21-00131                                                   Page 2

     **ORDERED** that the subject entries must be liquidated in accordance with the

final court decision, including all appeals, as provided for in section 516A(e) of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1516a(e) (2018).


                                   /s/     Mark A. Barnett
                                   Mark A. Barnett, Chief Judge

Dated: April 28, 2023
       New York, New York

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.      The filing has been prepared using a proportionally-spaced typeface and includes 6,380 words.

2.      The brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ David J. Ross
DAVID J. ROSS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000

November 6, 2023