No. 2023-2135

IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION,

*Plaintiffs-Appellants*,

DATONG JUQIANG ACTIVATED CARBON CO., LTD., SHANXI INDUSTRY TECHNOLOGY TRADING CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD.,

*Plaintiffs,*

v.

UNITED STATES, CALGON CARBON CORPORATION, NORIT AMERICAS INC., CABOT NORIT AMERICAS, INC.,

*Defendants-Appellees*.

Appeal from the United States Court of International Trade in No. 1:21-cv-00131, Chief Judge Mark A. Barnett

**BRIEF FOR DEFENDANT-APPELLEE UNITED STATES**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:

ASHLANDE GELIN
Attorney
Office of the Chief Counsel
  for Trade Enforcement
  & Compliance
U.S. Department of Commerce

ANTONIA R. SOARES
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington D.C. 20044
antonia.soares@usdoj.gov

January 22, 2024

Attorneys for Defendant-Appellee

# TABLE OF CONTENTS

STATEMENT OF THE ISSUE ................................................................i

STATEMENT OF THE CASE ...............................................................1

STATEMENT OF FACTS ....................................................................2

I.     Legal Framework For Surrogate Value Selection ...........................2

II.    Administrative Background ...............................................................4

    A.    Initiation And Preliminary Results .........................................4

    B.    Final Results ...........................................................................7

III.   Trial Court Proceeding In *Carbon Activated I* ...............................8

IV.   Remand Results And Subsequent Trial Court Proceeding In *Carbon Activated II*.........................................................................................9

SUMMARY OF THE ARGUMENT ....................................................12

ARGUMENT ......................................................................................15

I.     Standard Of Review............................................................................15

II.    The Trial Court's Judgment Sustaining Commerce's Surrogate Value Selection For Carbonized Material Was Supported By Substantial Evidence........................................................................16

    A.    Substantial Evidence Supports Commerce's Selection Of Coconut-Shell Charcoal As The Surrogate Value For Carbonized Materials ........................................................17

    B.    Commerce Reasonably Considered Its Long History Of Selecting Coconut Shell Charcoal As A Surrogate Value For Coal-Based Carbonized Materials ...............................19

    C.    Commerce's Reliance On The Activation Process Used To Produce Activated Carbon Was Supported By Substantial

Evidence ............................................................................26

III.   Carbon Activated Failed To Exhaust Administrative Remedies
       Related To Its Wood-Feedstock Argument....................................35

CONCLUSION .................................................................................37

# TABLE OF AUTHORITIES

**Cases**                                      **Page(s)**

*Albemarle Corp. v. United States*,
27 F. Supp. 3d.1336, 1351 (Ct. Int'l Trade 2014),
*aff'd in part, rev'd in part*, 821 F.3d 1345 (Fed. Cir. 2016) ...............................34

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
618 F.3d 1316 (Fed. Cir. 2010) .................................................................31

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
802 F.3d 1339 (Fed. Cir. 2015) .................................................................16

*Ancientree Cabinet Co. v. United States*,
532 F. Supp. 3d 1241 (Ct. Int'l Trade 2021) .........................................17

*Boomerang Tube, LLC, TMK IP-SCO v. United States*,
856 F.3d 908 (Fed. Cir. 2017) ...................................................................38

*Calgon Carbon Corp. v. United States*,
443 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) .........................................26

*Carbon Activated Tianjin Co. v. United States*,
547 F. Supp. 3d 1310 (Ct. Int'l Trade 2021) ................................... 20, 28

*Carbon Activated Tianjin Co. v. United States*,
586 F. Supp. 3d 1360 (Ct. Int'l Trade 2022) ................................... *passim*

*Carbon Activated Tianjin Co., Ltd. v. United States*,
633 F. Supp. 3d 1329 (Ct. Int'l Trade 2023) .................................... *passim*

*Coalition for the Preservation of Am. Brake Drum and
Rotor Aftermarket Mfr. v. United States*,
44 F. Supp. 2d 229 (Ct. Int'l Trade 1999) ............................................18

*Downhole Pipe & Equip., L.P. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015) ...............................................................3, 4

*Dupont Teijin Films USA, LP v. United States*,
407 F.3d 1211 (Fed. Cir. 2005) ...............................................................15

*Hebei Foreign Trade & Advertising Corp. v. United States*,
807 F. Supp. 2d 1317 (Ct. Int'l Trade 2011) ......................................................34

*Home Meridian Int'l. Inc. v. United States*,
772 F.3d 1289 (Fed. Cir. 2014) ...........................................................................17

*Jacobi Carbons AB v. United States*,
443 F. Supp. 3d 1312 (Ct. Int'l Trade 2020) ......................................................34

*JBF RAK LLC v. United States*,
790 F.3d 1358 (Fed. Cir. 2015) ...........................................................................24

*Jiaxing Bro. Fastener Co. v. United States*,
822 F.3d 1289 (Fed. Cir. 2016) ..................................................................... *passim*

*Jinan Yipin Corp. v. United States*,
971 F. Supp. 2d 1296 (Ct. Int'l Trade 2014) ................................................ 21, 28

*Nan Ya Plastics Corp. v. United States*,
810 F.3d 1333 (Fed. Cir. 2016) ...........................................................................17

*Nation Ford Chem. Co. v. United States,*
166 F.3d 1373 (Fed. Cir. 1999) ..................................................................... *passim*

*NSK Corp. v. United States Int'l Trade Comm'n*,
716 F.3d 1352 (Fed. Cir. 2013) ................................................................... 32, 34

*Qingdao Sea-Line Trading Co. v. United States,*
766 F.3d 1378 (Fed. Cir. 2014) ..................................................................... *passim*

*QVD Food Co. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011) ................................................................. 4, 17, 26

*Shakeproof Assembly Components, Div. of Illinois
Tool Works, Inc. v. United States*,
268 F.3d 1376 (Fed. Cir. 2001) ............................................................. 16, 32, 35

*Tianjin Wanhua Co., Ltd. v. United States*,
253 F. Supp. 3d 1318 (Ct. Int'l Trade 2017) ......................................................20

*United States Steel Corp. v. United States*,
621 F.3d 1351 (Fed. Cir. 2010) .............................................................................3

*United States v. Eurodif,*
  555 U.S. 305 (2009) ................................................................15

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States,*
  652 F.3d 1333 (Fed. Cir. 2011) .................................... 36, 37

## **Statutes**

19 U.S.C. § 1673 ........................................................................2

19 U.S.C. § 1677b(c) ........................................................ 3, 5, 16

19 U.S.C. § 1677(18)(A) ...........................................................5

28 U.S.C. § 2637(d) ................................................................38

## **Administrative Decisions**

*Certain Activated Carbon from the People's Republic of China,*
  74 Fed. Reg. 66,952 (Dep't Commerce Dec. 17, 2009) ...................................22

*Certain Activated Carbon From the People's Republic of China,*
  76 Fed. Reg. 67,142 (Dep't Commerce Oct. 31, 2011)...............................22, 33

*Certain Activated Carbon From the People's Republic of China,*
  78 Fed. Reg. 70,533 (Dep't Commerce Nov. 20, 2013).....................................22

*Certain Activated Carbon From the People's Republic of China,*
  82 Fed. Reg. 51,607 (Dep't Commerce Nov. 7, 2017).....................................22

*Certain Activated Carbon From the People's Republic of China,*
  84 Fed. Reg. 23,947 (Dep't Commerce April 30, 2020) ...................................6

*Certain Activated Carbon from the People's Republic of China,*
  86 Fed. Reg. 10,539 (Dep't of Commerce Feb. 22, 2021) ..................................6

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
  84 Fed. Reg. 27,587 (Dep't Commerce June 13, 2019) .......................................4

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5, counsel for defendant-appellee the United States states that she is unaware of any other appeal in or from these actions that previously was before this Court, or any other appellate court, under the same or similar title.  Defendant-appellee's counsel is also unaware of any case pending in this or any other court that may directly affect or be affected by the Court's decision in this appeal.

At the same time, counsel for the United States is aware of an action before this Court that counsel understands is not "related" within the meaning of the Court's rule, but involves issues similar to those raised in this appeal (in the context of the separate records of that case).  In *Carbon Activated Tianjin Co. v. United States*, No. 22-00017 (Ct. Int'l Trade), plaintiffs-appellants challenged the Department of Commerce's determination in the thirteenth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.  This case is currently on appeal in *Carbon Activated Tianjin Co. v. United States*, No. 2023-2413 (Fed. Cir.).

## STATEMENT OF THE ISSUE

Whether Commerce's determination to select Malaysian import data under Harmonized Tariff Schedule (HTS) heading 4402.90.1000 (coconut-shell charcoal) as the surrogate value for carbonized material (or carbmat) is supported by substantial evidence and in accordance with law.

## STATEMENT OF THE CASE[1]

This appeal concerns Commerce's final results in the twelfth administrative review (AR12) of the antidumping duty order on certain activated carbon from the People's Republic of China. *See Certain Activated Carbon from the People's Republic of China*, 86 Fed. Reg. 10,539 (Dep't of Commerce Feb. 22, 2021) (final admin. review) (*Final Results*) (Appx1066-1069), and the accompanying Issues and Decision Memorandum (IDM) (Appx1015-1065).

Plaintiffs-appellants Carbon Activated Tianjin Co., Ltd. (Carbon Tianjin) and Carbon Activated Corporation (collectively, Carbon Activated) appeal the decision from the United States Court of International Trade sustaining Commerce's selection of Malaysian import data under HTS 4402.90.1000 (coconut-shell charcoal) to value coal-based carbonized material, which is a raw material input used by Carbon Activated to produce activated carbon. *Carbon*

---

[1] Pursuant to Federal Rule of Appellate Procedure 28(b) and Federal Circuit Rule 28(b), we include statements of the case and facts because we disagree with plaintiffs-appellants' statement of the case and facts.

*Activated Tianjin Co., Ltd. v. United States*, 633 F. Supp. 3d 1329 (Ct. Int'l Trade 2023) (*Carbon II*) (Appx48-66).

## STATEMENT OF FACTS

## I.     Legal Framework For Surrogate Value Selection

The antidumping duty statute is a remedial scheme that applies duties to foreign goods sold, or likely to be sold, in the United States "at less than its fair value." 19 U.S.C. § 1673. Commerce is responsible for investigating whether there have been, or are likely to be, sales at less-than-fair value. *Id.* § 1673(1). If Commerce determines that there have been sales at less-than-fair value, Commerce issues an antidumping order. *Id.* The order contains the scope, which is a description of the merchandise that is covered by the order. *Id.* §§ 1671e(a)(2), 1673e(a)(2).

Once Commerce issues an antidumping duty order (*see id.* §§ 1673a, 1673b(b), (d), 1673d(a), (c)), it conducts administrative reviews, such as the subject review, to determine the amount of duties owed. *Id.* § 1675(a)(1), (2)(A). In so doing, Commerce calculates a "dumping margin" for each entry of subject merchandise under review. *Id.* § 1675(a)(2)(A)(ii). A dumping margin is the amount by which the "'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) or 'constructed export price.'" *United States Steel Corp. v. United States*, 621 F.3d

1351, 1353 (Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)) (internal footnotes omitted).

When, as here, an antidumping duty proceeding involves a nonmarket economy country such as China, Commerce determines normal value by valuing the "factors of production" such as raw materials used in producing the merchandise in a comparable market economy to come up with "surrogate values." 19 U.S.C. § 1677b(c)(1)(B).  In doing so, Commerce "attempt{s} to construct a hypothetical market value of that product" in the nonmarket economy.  *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1375 (Fed. Cir. 2015) (quoting *Nation Ford Chem. Co. v. United States,* 166 F.3d 1373, 1375 (Fed. Cir. 1999)).  Commerce must value the factors of production "to the extent possible . . . in one or more market economy countries that are — (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(4)(A)-(B).

"The statute also directs Commerce to value the factors of production 'based on the *best available information* regarding the values of such factors in a market economy country.'"  *Downhole Pipe & Equip., L.P.*, 776 F.3d at 1375 (quoting 19 U.S.C. § 1677b(c)(1)(B) (emphasis added).  Because the statute is silent as to what constitutes the "best available information," Commerce has broad discretion in

3

deciding what record evidence meets those criteria.  *See, e.g.*, *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1294 (Fed. Cir. 2016) (*Jiaxing II*); *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (describing Commerce's discretion as "broad" or "wide" (citations omitted)).  However, "Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Downhole Pipe & Equip., L.P.*, 776 F.3d at 1375 (quoting *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014)).

## II.    <u>Administrative Background</u>

### A.    <u>Initiation And Preliminary Results</u>

On June 13, 2019, Commerce initiated the administrative review of the antidumping duty order on activated carbon from China for the period of review of April 1, 2018 through March 31, 2019.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 27,587, 27,589-27,590 (Dep't Commerce June 13, 2019) (initiation notice) (Appx2781-2794).  Commerce selected two mandatory respondents:  Carbon Activated Tianjin Co., Ltd. (Carbon Activated Tianjin) and Datong Juqiang Activated Carbon Co., Ltd. (DJAC) (collectively, mandatory respondents).  Appx1267.

Because Commerce continues to consider China a non-market economy, Commerce turned to the selection of one or more market-economy countries to act as surrogates in the valuation of the mandatory respondents' factors of production. *See* 19 U.S.C. §§ 1677(18)(A), 1677b(c).  Commerce identified a non-exhaustive list of six potential market-economy surrogates at the same level of economic development as China during the period of review:  Brazil, Bulgaria, Malaysia, Mexico, Russia, and Turkey.  Appx1479, Appx1483.  Commerce invited interested parties to comment on the surrogate country list, the selection of the surrogate country, and surrogate value data.  Appx1479-1480

In October 2019, petitioners Calgon Carbon Corporation and Cabot Norit Americas Inc. submitted comments on surrogate country selection in which they advocated for Commerce's selection of Malaysia or Mexico.  Appx1523-1530. Mandatory respondents Carbon Activated and DJAC submitted rebuttal comments on surrogate country selection in which they objected to both Malaysia and Mexico, but did not make an explicit recommendation of their own.  Appx1531-1536.  In November 2019, petitioners submitted initial surrogate value comments that included Malaysian data to value all factors of production.  Appx1537-1678. Respondents also submitted initial surrogate value comments.  Appx1679-1779.  In March 2020, petitioners submitted their final surrogate value comments, as did

respondents.  Appx3100-3136, Appx3142-4118.  On April 9, 2020, Carbon

Activated submitted final surrogate value rebuttal comments.  Appx4317-4351.

    In April 2020, Commerce published the preliminary results of its review.

*See Certain Activated Carbon From the People's Republic of China*, 84 Fed. Reg.

23,947 (Dep't Commerce April 30, 2020) (*Preliminary Results*), and

accompanying Preliminary Decision Memorandum (PDM).  Appx4530-4561.

Commerce preliminarily determined that Malaysian data constituted the best

available information for valuing the respondents' factors of production and

selected Malaysia as the primary surrogate country.  Appx4540-4547.  Commerce

reasoned that the record contained complete, reliable, and usable surrogate value

data from Malaysia for all reported factors of production.  Appx4545.  Citing

Commerce's regulatory preference to value all factors of production data in a

single surrogate country, Commerce further explained that Malaysia was a better

choice than the other countries on the record such as Mexico, Russia, or Brazil,

because the data on record for those countries permitted valuation of only some,

but not all, factors of production.  *Id.*  Commerce ultimately calculated preliminary

weighted-average dumping margins for Carbon Activated (1.66 percent) and

DJAC (0.22 percent), as well as a separate rate for non-examined respondents

(0.49 percent).  Appx4564.

### B.    <u>Final Results</u>

In February 2021, Commerce issued the *Final Results* (Appx1066-1069), accompanied by an issues and decision memorandum (IDM) (Appx1015-1065).  In relevant part, Commerce continued to rely on Malaysia as the primary surrogate country for the valuation of all material inputs.  Appx1045-1046.

On appeal to this Court, Carbon Activated challenges Commerce's selection of the surrogate value for the coal-based carbonized material that is an input to Carbon Activated's product.  In the *Final Results*, Commerce selected Malaysian import data under HTS 4402.90.1000 (coconut shell charcoal) as the surrogate value for the coal-based carbonized materials used in the production of activated carbon.  Appx1057.  The mandatory respondents had instead advocated for the use of Malaysian import data under the six-digit HTS heading 4402.90 (wood charcoal (including shell or nut charcoal), excluding that of bamboo), which is a basket category that encompasses both coconut shell charcoal (HTS 4402.90.1000) and other wood-based charcoal (HTS 4402.90.9000).  Appx1055, Appx1057.  Commerce explained that it selected Malaysian import data under HTS 4402.90.1000 (coconut shell charcoal) after finding that there was no evidence on

the record that either of the mandatory respondents used wood charcoal (the other

product in the basked category) to produce the subject merchandise.  Appx1057.[2]

The agency also made changes to the margin calculations, resulting in higher

final weighted-average dumping margins for Carbon Activated Tianjin (1.83

percent), for DJAC (0.38 percent), and for the separate rate respondents (0.65

percent).  Appx4789, Appx4785, Appx4782.

## III.    Trial Court Proceeding In *Carbon Activated I*

On appeal to the Court of International Trade, Carbon Activated challenged

seven of Commerce's surrogate value selections used to value the respondents'

factors of production.  *Carbon Activated Tianjin Co. v. United States*, 586 F. Supp.

3d 1360 (Ct. Int'l Trade 2022) (*Carbon I*) (Appx1-47).  The seven challenged

values were bituminous coal, anthracite coal, hydrochloric acid, carbonized

materials, liquid caustic soda, steam, and surrogate financial ratios.  *Carbon I*, 586

F. Supp. 3d at 1364.  On August 8, 2022, the trial court sustained Commerce's

determinations with respect to five of the material inputs, but remanded

---

[2]  For clarity, during the administrative proceedings in this case, Commerce used the phrase "wood charcoal" to describe the other wood-based charcoal classified under Malaysian HTS 4402.90.9000.  Commerce also described wood charcoal as "wood carbmat" during remand proceedings.  Appx4800.  Although Malaysian HTS 4402.90 also refers to "wood charcoal," this classification is broader and includes coconut shell charcoal classified under HTS 4402.90.1000.

Commerce's valuation of carbonized materials and its selection of surrogate financial ratios for further explanation or reconsideration. *Id.* at 1379-1382.

In reviewing Commerce's determination, the trial court held that although Commerce found that the respondents' suppliers did not purchase carbonized material that was made from wood charcoal so as to merit the inclusion of HTS 4402.90.9000 (other wood charcoal), Commerce made no analogous finding as to whether the suppliers purchased carbonized material made from coconut shell charcoal. *Id.* at 1379. The trial court found that "Commerce { } failed to explain its choice between two imperfect datasets" and, thus, remanded Commerce's selection of coconut-shell charcoal (HTS 4402.90.1000) over wood charcoal (HTS 4402.90) for further explanation or reconsideration. *Id.*

## IV. Remand Results And Subsequent Trial Court Proceeding In *Carbon Activated II*

On November 17, 2022, Commerce filed its remand results that further explained its selection of the surrogate value for coconut shell charcoal. Appx4792-4824. Commerce continued to find that import data reported under Malaysian HTS 4402.90.1000 (coconut shell charcoal) was the best available information to value coal-based carbonized material. Appx4798-4800. Because the record contained no evidence that the mandatory respondents purchased or used either coconut shell charcoal or wood charcoal to produce activated carbon exported to the United States, Commerce looked to other sources to select the best

9

available information to value Carbon Activated's coal-based carbonized materials. Appx4799-4803.

Commerce's selection of coconut shell charcoal as the best available information to value carbonized material relied on three bases. Appx4800-4803. First, Commerce relied on other administrative reviews in which the respondents provided record evidence to demonstrate that they actually used coconut shell charcoal in the production of activated carbon, as well as administrative reviews in which Commerce selected coconut-shell as a surrogate value for carbonized material. Appx4800. Absent new facts to warrant a departure from previous reviews, Commerce found it reasonable to continue to use coconut-shell charcoal to value carbonized materials in this review. Appx4802.

Second, Commerce relied on an International Trade Commission (ITC) report placed on the record by Carbon Activated and DJAC stating that the physical properties of activated carbon "depend on the raw materials used, *as well as the activation process*." Appx4801 (emphasis in the original). The ITC report further stated that chemically activated carbon is generally made using wood. *Id.* Because chemically activated carbon is generally made using wood, and the mandatory respondents reported only using steam activation during the period of review, Commerce found that Malaysian HS 4402.90, which includes wood-based

activated carbon, was not the best information to value the respondents' carbonized material.  Appx4802.

Third, Commerce relied on the fact that it has consistently selected the more specific subheading category of coconut shell charcoal to value the mandatory respondents' carbonized material in this proceeding.  Appx4802.

Commerce found that the mandatory respondents had not provided any new evidence in this review to warrant a departure from Commerce's practice of selecting coconut-shell charcoal to value the respondents' carbonized material in this proceeding.  *Id*.  Absent new facts with respect to the materials used in producing the subject merchandise, Commerce continued to use the same HTS subheading for "coconut-shell charcoal" to value carbonized material because doing so "avoids potential distortion arising from the parties' arguing merely for the most advantageous {surrogate value} and limits the potential for endless cherry pickings of datasets based on the mere disagreement in how Commerce should exercise its discretion in {surrogate value} selection." *Id*.

On April 28, 2023, the trial court sustained Commerce's remand results, holding that that the agency's selection of coconut shell charcoal to value the respondents' coal-based carbonized materials was supported by substantial evidence.  *Carbon II*, 633 F. Supp. 3d at 1335-1336.  In observing that Commerce considered the history of this antidumping duty order in its determination, the trial

11

court recognized that, "{w}hile it is true that each review is separate and based on the record developed before the agency in that review, that legal truism does not prevent Commerce from acting in accord with prior reviews when the record of the present review does not contain new or additional facts warranting a departure from the agency's prior practice." *Id*. at 1335.

On the same day, the Court entered judgment in favor of the United States. Appx67-68. This appeal followed.

## SUMMARY OF THE ARGUMENT

In the widely discretionary area of surrogate-value selection, Commerce faced two options to value carbonized material: Malaysian HTS 4402.90, the basket category that includes other wood charcoal, and Malaysian HTS 4402.90.1000, a more precise category within the basket that is limited to coconut shell charcoal. Commerce was also presented with a record containing no evidence indicating that the mandatory respondents purchased or used either wood charcoal or coconut shell charcoal to produce activated carbon exported to the United States. In light of this sparse record, Commerce determined to value Carbon Activated's carbonized materials using Malaysian import data under HTS 4402.90.1000 (coconut shell charcoal) based on three reasons: (1) previous reviews in which it also selected coconut shell charcoal as the surrogate value and previous reviews in which respondents used coconut shell charcoal to produce

activated carbon; (2) record evidence demonstrating that wood charcoal generally undergoes a chemical activation process that is distinct from the steam or thermal activation process of the coal-based carbonized materials used by the mandatory respondents; and (3) Commerce's consistent selection of the more specific subheading category — that is, coconut shell charcoal — to value the mandatory respondents' coal-based carbonized material throughout the history of this order.

Carbon Activated's arguments in favor of the alternative dataset are not supported by law or the administrative record, and reflect nothing more than disagreement with Commerce's lawful exercise of its discretion to weigh the evidence. First, Carbon Activated challenges Commerce's consideration of previous reviews in which Commerce selected coconut shell charcoal as the surrogate value for carbonized materials and its consideration of previous reviews in which respondents used coconut shell charcoal to produce the subject merchandise. Carbon Activated fails to show why it was unreasonable for Commerce to consider previous reviews given the sparse record in this administrative review.

Second, Carbon Activated challenges Commerce's reliance on the activation process in determining to select coconut shell charcoal as the surrogate value for carbonized material. In this administrative review, Carbon Activated reported that it produces only steam activated carbon. The scope of the antidumping duty order

13

for activated carbon covers only steam activated carbon while chemically activated carbon is not considered subject merchandise.  Record evidence established that chemically activated carbon is generally made using wood.  Given that Carbon Activated reported producing only steam activated carbon and that chemically activated carbon is generally made using wood, Commerce reasonably determined that it was not appropriate to use Malaysian imports under HTS 4402.90, which includes other wood, to value the coal-based carbonized used to produce steam activated carbon.  Carbon Activated fails to demonstrate that Commerce unreasonably relied on the record evidence establishing that wood charcoal generally undergoes a chemical activation process that is distinct from the steam or thermal activation of the coal-based carbonized materials used by the mandatory respondents.

Because the record contains no information regarding the materials used to warrant a departure from Commerce's practice from past proceedings and the record establishes that wood charcoal generally undergoes a chemical activation process that is distinct from the steam or thermal activation of the coal-based carbonized materials used, Commerce reasonably exercised its discretion and

expertise in selecting Malaysian imports under HTS 4402.90.1000 (coconut-shell charcoal) to value coal-based carbonized materials.

Accordingly, the Court should affirm the trial court's judgment sustaining Commerce's determination.

## ARGUMENT

### I.    Standard Of Review

The Court applies the same standard of review that was applied by the trial court. *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005). Accordingly, the Court will uphold Commerce's determination "unless it is unsupported by substantial record evidence or is not in accordance with the law." *Id.* (citing 19 U.S.C. § 1516a(b)(1)(B)(i)); *see also United States v. Eurodif*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which {Commerce} relies . . . are conclusive unless unsupported by substantial evidence.").

While Commerce must defend its surrogate choices, an interested party arguing that data is aberrational or unreliable bears the burden of supporting its argument with sufficient evidence. *See Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241, 1254 (Ct. Int'l Trade 2021) (citing *QVD Food Co.*, 658 F.3d at 1324 (recognizing that when there is insufficient evidence to determine certain data aberrational or unreliable, Commerce has no basis for rejecting the data).

"The burden of creating an adequate record lies with interested parties and not with

Commerce . . . {;} {this} burden on interested parties stems from the fact that the

International Trade Administration, the relevant agency within Commerce, has no

subpoena power." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1338

(Fed. Cir. 2016) (cleaned up).

The data that Commerce relies on need not be perfect. *Jiaxing II*, 822 F.3d

at 1301 (citing *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289, 1296

(Fed. Cir. 2014)). Nor is Commerce required to duplicate the precise experience of

the manufacturer in the non-market economy. *Nation Ford*, 166 F.3d at 1377

(citation and quotations omitted). Instead, Commerce seeks to identify and rely on

the record data that "most accurately represents the fair market value" of the

relevant factor of production. *Id*. Commerce "need not prove that its methodology

was the only way or even the best way to calculate surrogate values for factors of

production as long as it was a reasonable way." *Coalition for the Preservation of*

*Am. Brake Drum and Rotor Aftermarket Mfr. v. United States*, 44 F. Supp. 2d 229,

258 (Ct. Int'l Trade 1999).

## II.    The Trial Court's Judgment Sustaining Commerce's Surrogate Value Selection For Carbonized Material Was Supported By Substantial Evidence

The Court should affirm the trial court's judgment sustaining Commerce's

selection of Malaysian HTS 4402.90.1000 (coconut shell charcoal) as the best

16

available information on the record to value Carbon Activated's coal-based

carbonized material. As demonstrated below, Carbon Activated's arguments

challenging Commerce's surrogate value selection are not supported by the record

or governing law, and reflect nothing more than disagreement with Commerce's

lawful exercise of discretion to weigh the evidence differently.

A. **Substantial Evidence Supports Commerce's Selection Of Coconut-Shell Charcoal As The Surrogate Value For Carbonized Materials**

On remand, Commerce continued to rely on Malaysian HTS 4402.90.1000

(coconut shell charcoal) to value respondents' carbonized materials based upon

further analysis of the record evidence and consideration of Commerce's practice

in past segments of the proceeding. Appx4798-4803. When analyzing the record,

Commerce found that there was no evidence that the mandatory respondents used

coconut shell charcoal or wood charcoal to produce activated carbon exported to

the United States. Appx4799-4800. As a result, Commerce considered other

sources on the record, as well as its long history of selecting coconut shell charcoal

as the appropriate surrogate value for coal-based carbonized material. Appx4800-

4803, Appx4809-4810. Specifically, substantial evidence supported the selection

of coconut shell charcoal as the best available information on the record based on:

(1) the history of respondents previously using coconut shell charcoal to produce

activated carbon and of Commerce using coconut shell charcoal as the surrogate

value for carbonized material; (2) record evidence demonstrating that wood charcoal generally undergoes a chemical activation process that is distinct from the steam or thermal activation process of the coal-based carbonized materials used by the mandatory respondents; and (3) Commerce consistently selecting the more specific subheading category — that is, coconut shell charcoal — to value the mandatory respondents' coal-based carbonized materials throughout the history of this order.  Appx4800-4803.

Based on its longstanding practice of finding coconut-shell charcoal to be comparable to coal-based carbonized material and the evidence on the record that the activation process for activated carbon supported using a surrogate value for coconut shell charcoal, Commerce reasonably declined to select the basket category under HTS 4402.90 as the surrogate value for carbonized material.  *See, e.g.*, *See Qingdao Sea-Line Trading Co.*, 766 F.3d at 1386 (recognizing Commerce's methodology from prior administrative reviews and respondents' failure to provide sufficient evidence showing that its proposed alternative would yield a more accurate result); *Carbon Activated Tianjin Co. v. United States*, 547 F. Supp. 3d 1310, 1320 (Ct. Int'l Trade 2021) (recognizing that plaintiffs must "identify any record evidence" in support of their objection to Commerce's use of a particular dataset; it is not enough for plaintiffs to "simply disagree with Commerce's use of such data"); *Tianjin Wanhua Co., Ltd. v. United States*, 253 F.

18

Supp. 3d 1318, 1324 (Ct. Int'l Trade 2017) (holding that respondent was required to establish that the requested values were "the one and only reasonable surrogate selection on {the} administrative record, not simply that {the requested value} may have constituted another possible reasonable choice"); *Jinan Yipin Corp. v. United States*, 971 F. Supp. 2d 1296, 1314 (Ct. Int'l Trade 2014) ("The evidence that the {respondents} cite is neither so clear nor so strong as to require Commerce to reach a result other than that which the agency reached{.}").

### B.    Commerce Reasonably Considered Its Long History Of Selecting Coconut Shell Charcoal As A Surrogate Value For Coal-Based Carbonized Materials

Carbon Activated contends that Commerce's surrogate value determination is not supported by substantial evidence because it is based on inaccurate factual findings and the mischaracterization of its past proceedings.  CA Br. at 15-24.  As demonstrated below, Carbon Activated's arguments are without merit.

First, Carbon Activated challenges as factually incorrect Commerce's finding that "{t}here is a long, demonstrable history in this proceeding of using coconut-shell carbmat in the production of the subject merchandise, unlike wood carbmat, which has never been used to produce the subject merchandise."  CA Br. at 15, 16.  This is so, Carbon Activated contends, because in the previous reviews that Commerce cited in support of the finding, the mandatory respondents reported using *coal-based* carbonized materials to produce the subject merchandise, not

19

coconut-shell carbmat.  *Id.* at 16-17.  Regardless of whether the respondents in the previous reviews reported using coal-based carbonized materials, in those reviews, like here, Commerce selected coconut shell charcoal as the appropriate surrogate value.  *See Certain Activated Carbon From the People's Republic of China*, 76 Fed. Reg. 67,142 (Dep't Commerce Oct. 31, 2011) and accompanying IDM at cmt. 4(b) (AR3) ("'Coconut Shell Charcoal' results in a better, input-specific price for coal-based carbonized materials."); *Certain Activated Carbon From the People's Republic of China*, 78 Fed. Reg. 70,533 (Dep't Commerce Nov. 20, 2013) and accompanying IDM at cmt. 6 (AR5) ("In past decisions and on remand, because {surrogate value} information specific to coal-based carbonized materials was not available, {Commerce} has found coconut shell charcoal is the best available information with which to value respondents' coal-based carbonized materials, based on the product specifications."); *Certain Activated Carbon From the People's Republic of China*, 82 Fed. Reg. 51,607 (Dep't Commerce Nov. 7, 2017) and accompanying IDM at cmt. 5 (AR9) (mandatory respondents arguing against wood-based charcoal as a surrogate value, contending that "the Thai GTA data for carbonized material is aberrant because it includes data for imports from France which are based on far more expensive, wood-based charcoal").

Further, Carbon Activated fails to recognize that respondents have reported using coconut shell carbonized materials in prior segments of the proceeding.  *See*

20

*Certain Activated Carbon from the People's Republic of China*, 74 Fed. Reg.

51,257 (Dep't Commerce Dec. 17, 2009) (amended final results), and

accompanying IDM at cmt. 3(e) (AR1 IDM) (finding that "record evidence

indicates that both {respondents} use coconut shells in their production

processes"); *Certain Activated Carbon From the People's Republic of China*, 77

Fed. Reg. 67,337 (Dep't Commerce Nov. 9, 2012), (final results) and

accompanying IDM (AR4 IDM) ("{W}e note that {the respondent} uses both

coconut charcoal and other carbonized materials as an input{.}").

Second, Carbon Activated erroneously contends that Commerce's finding

related to past reviews "was one of the principal bases that Commerce relied upon

to justify its use of the petitioners' preferred surrogate value . . ., and it was the

principal basis that the {trial court} cited in affirming Commerce's determination."

CA Br. at 16 (citing Appx4800 & Appx56). Although making this finding,

Commerce also relied for its surrogate value determination on the following

additional bases: (1) record evidence establishing that chemically activated carbon

is generally made using wood whereas the respondents both reported that they

produce only steam activated carbon; and that (2) Commerce has consistently

selected the more specific subheading category to value the mandatory

respondents' carbonized material in this proceeding. Appx4801-4803. In light of

this record, it was reasonable for Commerce to continue to use coconut-shell

21

charcoal to value coal-based carbonized materials in this review, and avoid "the potential distortion arising from the parties' arguing merely for the most advantageous {surrogate value} and limit{ } the potential for endless cherry pickings of data sets based on the mere disagreement in how Commerce should exercise its discretion in {surrogate value} selection." Appx4802.

In any event, Carbon Activated has failed to demonstrate that Commerce's consideration of previous reviews was unlawful given the lack of evidence on the record indicating that the mandatory respondents purchased or used coconut shell charcoal or wood-based carbonized materials in the production of activated carbon. Thus, Commerce lawfully considered its selection of coconut shell to value coal-based carbonized materials in previous administrative reviews. *See Jiaxing II*, 822 F.3d at 1298 ("When Congress does not mandate a procedure or methodology for applying a statutory test, 'Commerce may perform its duties in the way it believes most suitable.'") (quoting *JBF RAK LLC v. United States*, 790 F.3d 1358, 1364 (Fed. Cir. 2015)). Although each administrative review is considered a separate exercise of Commerce's statutory authority that allows for different conclusions based on different facts in the record, Commerce is permitted to act in accordance with prior reviews when the record of the present review does not contain new or additional facts warranting a departure from the agency's prior practice. *See Qingdao Sea-Line Trading Co.*, 766 F.3d at 1386 ("The record further supports

Commerce's decision to use the IMF WPI index to adjust the non-contemporaneous garlic prices{ }" because "Commerce first noted that it has used the IMF index in prior administrative reviews to adjust prices{,}" and "Commerce further found that {appellant} failed to provide sufficient evidence showing that either of its proposed alternative methods would yield a more accurate result.").

Third, Carbon Activated challenges Commerce's statement that it "has consistently selected the more specific subheading category (*i.e.*, coconut shell charcoal) to value the mandatory respondents' carbmat in this proceeding" because "AR12 is the first review that involved a choice between a surrogate value based on a basket HTS heading that covered both coconut shell charcoal and other wood charcoal (4402.90) and an alternative surrogate value based on a more specific HTS subheading limited to coconut shell charcoal (4402.90.1000)." CA Br. at 17-18. But with its statement, Commerce was merely conveying that it has consistently selected coconut shell charcoal to value carbonized materials — *not* that it has consistently selected coconut shell charcoal when faced with the same options as in this administrative review. Appx4802. Moreover, while this Court and the trial court have sustained Commerce's reliance on basket categories when the record lacked evidence to justify a more specific HTS heading classification, a more specific classification category is preferred if the record allows for it. *See, e.g.*, *SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1360 (Fed. Cir.

2020) (observing that "Commerce rejected classification under HTS subheading 3920.99 because the subheading is not specific to the material{,}'" and holding that "Commerce's reasonable choice of the more specific HTS categories is supported by substantial evidence"). Here, Commerce has consistently selected the more specific subheading category of coconut shell charcoal to value the mandatory respondents' coal-based carbonized materials. Appx4802.

Fourth, Carbon Activated devotes pages of its brief to arguing that Commerce erroneously relied on the first and fifth administrative reviews for its surrogate value selection because "the evidence it relied upon to justify its choice of surrogate values in AR1 and AR5 is not pertinent to the respondents in AR12 and not on the record of AR12." CA Br. at 19; *see also id.* at 19-22. But Commerce did not rely on *evidence* from those prior reviews to justify its surrogate value selection in AR12. Rather, Commerce considered the previous reviews in which it selected coconut shell charcoal as a surrogate value for coal-based carbonized material. Appx4800. As the trial court recognized, "{w}hile it is true that each review is separate and based on the record developed before the agency in that review, that legal truism does not prevent Commerce from acting in accord with prior reviews when the record of the present review does not contain new or additional facts warranting a departure from the agency's prior practice." *Carbon Activated Tianjin Co.*, 633 F. Supp. 3d at 1335. Here, although bearing "the

24

burden of creating an adequate record{,}" Carbon Activated failed to provide new evidence to warrant a departure. *See, e.g., Calgon Carbon Corp. v. United States*, 443 F. Supp. 3d 1334, 1345 (Ct. Int'l Trade 2020) ("the burden of creating an adequate record lies with {interested parties} and not with Commerce") (citing *QVD Food Co.*, 658 F.3d at 1324).

Fifth, Carbon Activated contends that Commerce ignored its fact finding in the draft remand redetermination in which it acknowledged that the record "contains no evidence that the mandatory respondents purchased or used coconut shell charcoal to produce activated carbon exported to the United States." CA Br. at 21-22 (quoting Appx4900). But Commerce's final remand redetermination includes the same finding. *See* Appx4799-4800 ("Upon further review of the record evidence, we find the record also contains no evidence that the mandatory respondents purchased or used coconut shell charcoal to produce activated carbon exported to the United States.").

Finally, Carbon Activated contends that "there is no evidence on the record . . . that respondents' subject merchandise *could not* be made from wood-based charcoal." CA Br. at 23. But the absence of such evidence did not obligate Commerce to select a basket inclusive of wood-based charcoal over a surrogate value that has been routinely used in the past. *See Carbon Activated Tianjin Co.*, 547 F. Supp. 3d at 1320 (recognizing that plaintiffs must "identify any record

evidence" in support of their objection to Commerce's use of a particular dataset; it is not enough for plaintiffs to "simply disagree with Commerce's use of such data"); *see also Jinan Yipin Corp.*, 971 F. Supp. 2d at 1314 ("The evidence that the {respondents'} cite is neither so clear nor so strong as to require Commerce to reach a result other than that which the agency reached{.}").  Here, Commerce reasonably explained its determination to follow its longstanding practice and rely on an HTS classification specific to coconut shell charcoal, particularly where there was no evidence that respondents used wood charcoal in the production of activated carbon.  Appx4799.

In sum, Commerce reasonably considered the long history of the antidumping duty order for activated carbon from China and the lack of evidentiary support to warrant a departure from its practice of selecting coconut shell charcoal to value coal-based carbonized materials.

### C.    Commerce's Reliance On The Activation Process Used To Produce Activated Carbon Was Supported By Substantial Evidence

In making its surrogate value selection, Commerce reasonably relied on record evidence related to the activation process used to produce activated carbon. Appx4801-4803.  Carbon Activated raises several challenges to Commerce's reliance on this evidence, all of which lack merit.

First, Carbon Activated misunderstands Commerce's reliance on the activation process used to produce activated carbon, characterizing the issue as "an alleged difference in the activation processes used to produce wood-based charcoal and coal-based carbonized materials." CA Br. at 24. But the activation process governs the production of activated carbon — not the material inputs of wood-based charcoal and coal-based carbonized materials. Appx4801-4803. As discussed above, the administrative record contains no direct evidence that coal-based carbonized materials, coconut shell charcoal, and wood-based charcoal share similar physical or chemical properties. Appx4800 (citing Appx3277-3278). Because the physical properties of activated carbon depend not only on the input materials used, but also on the activation process, Commerce reasonably relied on the activation process for steam activated carbon in making its surrogate value selection. Appx4801-4803. In this administrative review, the respondents both reported that they produce only steam activated carbon. Appx4801. The scope of the order covers only steam activated carbon while chemically activated carbon is not considered subject merchandise. *See* Appx4726 (scope stating that "{e}xcluded from the scope of the order are chemically activated carbons"). The ITC report on the record stated that chemically activated carbon is generally made using wood. Appx4801 (citing Appx3261-3276). Given that the mandatory respondents reported that they produce only steam activated carbon and that

27

chemically activated carbon is generally made using wood, Commerce reasonably determined that it was not appropriate to use Malaysian imports under HTS 4402.90 (which includes other wood) to value the coal-based carbonized used to produce steam activated carbon. *See Qingdao Sea-Line Trading Co.*, 766 F.3d at 1386 (providing that "Commerce generally selects, to the extent practicable, surrogate values that are," among other things, "product-specific").

Second, Carbon Activated further mischaracterizes Commerce's analysis by stating that "Commerce erroneously inferred from the ITC's statement that steam activated carbon could not be made using wood charcoal." CA Br. at 25. Commerce made no such statement in its remand results, and Carbon Activated cites no support. Based on the limited information placed on the record by the mandatory respondents, Commerce relied on the ITC report in explaining that this evidence indicated that chemically activated carbon is generally made using wood charcoal. Appx4801 (citing Appx3261-3276). Further, the trial court did not state that this finding was "unfounded," as Carbon Activated claims. CA Br. at 25. Rather, the trial court found that, "{w}hile this does not mean that steam activated carbon, the subject merchandise produced by Plaintiffs, is not or cannot be produced with wood-based charcoal, Commerce's analysis did not stop there." *Carbon Activated Tianjin Co.*, 633 F. Supp. 3d at 1335. The trial court continued that, Commerce considered the history of this antidumping duty order, which

included "using coconut-shell carbmat in the production of the subject merchandise, unlike wood carbmat, which has never been used to produce the subject merchandise." *Id.*

Third, Carbon Activated contends that the record evidence indicates that steam activated carbon *can* be made using wood charcoal.  CA Br. at 25-26 (citing the fourth administrative review IDM & Appx1016).  But whether activated carbon "can" be manufactured from wood charcoal does not change the fact that there is no evidence that wood charcoal has been used to produce subject merchandise throughout the long history of this antidumping duty order.  Appx4800.  Further, that a surrogate value *can* be used in the production of activated carbon did not obligate Commerce to select it.  *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1322 (Fed. Cir. 2010) ("Commerce has broad discretion to determine the best available information for an antidumping review.") (citing *Nation Ford Chem. Co.*, 166 F.3d at 1377 (holding that the statute "accords Commerce wide discretion in the valuation of factors of production in the application of those {statutory} guidelines"); *Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001) (recognizing "Commerce's special expertise").

Fourth, Carbon Activated contends that Commerce unlawfully ignored that part of the ITC report detracting from Commerce's conclusion.  CA Br. at 26-27.

Specifically, Carbon Activated asserts that "the ITC reports detail key differences in the physical characteristics between coconut-shell and coal-based carbmat — including in pore size, pore distribution, and hardness — and how these differences in physical characteristics impact the end-uses of activated carbon made using coconut-shell and coal-based carbmat."  CA Br. at 26 (citing Appx3261-3276).  Carbon Activated fails to show how this information supports a determination that Commerce was obligated to use a surrogate value that included wood charcoal to value the mandatory respondents' coal-based carbonized materials. *See NSK Corp. v. Int'l Trade Comm'n*, 716 F.3d 1352, 1366 (Fed. Cir. 2013) ("Although there is evidence that detracts from the {agency's} ultimate conclusion . . ., we cannot say that this conflicting evidence casts such doubt on the {agency's} conclusions{.}").

Moreover, Commerce did not "unlawfully ignore{ }" the chemical properties and manufacturing process of activated carbon discussed in the ITC report, as Carbon Activated claims.  CA Br. at 26.  In the remand results, Commerce stated that "{t}he ITC Report explains that coconut-shell-based activated carbon and wood-based activated carbon differ from coal-based activated carbon; the former has greater hardness and pore sizes, and the latter has lower hardness."  Appx4801.  But Commerce found that "coconut shell charcoal shares similar properties with coal-based carbonized material, namely, porosity and adsorption, and . . . those similar properties are essential in the production of

30

activated carbon." Appx4800 n.26; *see also Certain Activated Carbon From the People's Republic of China*, 76 Fed. Reg. 67,142 (Dep't Commerce Oct. 31, 2011) and accompanying IDM at cmt. 4(b) (AR3) (finding that "coconut shell charcoal shares similar properties with carbonized material and that those similar properties are essential in the production of activated carbon").

Further, Carbon Activated's reliance on the end-uses of activated carbon made using coconut-shell and coal-based carbonized material also fails. CA Br. at 26. Commerce rejected Carbon Activated's end-use arguments because they were unsupported by the record. Appx4819-4820. Carbon Activated fails to explain why Commerce's analysis was incorrect. *See Changzhou Trina Solar Energy Co., Ltd. v. United States*, 975 F.3d 1318, 1332-1333 (Fed. Cir. 2020) (observing that, on appeal, appellant "proffers the same rejected evidence . . . and 'invite{s} {us} to reweigh {it},'" and holding that "{w}e decline to do so") (quoting *Downhole Pipe*, 776 F.3d at 1376). And as discussed above, the ITC report states that the physical properties of activated carbon "depend on the raw materials used, *as well as the activation process*." Appx4801 (emphasis in the original). Thus, Commerce reasonably examined the activation process. Appx4801-4803.

Fifth, Carbon Activated takes issue with the several reviews and court cases that Commerce cited to explain how Commerce has demonstrated in the past that coconut shell charcoal and coal-based carbonized materials "share{ } many

similarities." CA Br. at 27-28. Carbon Activated attempts to distinguish each

cited review and court case on the basis that no party in those reviews or cases

advocated using wood-based charcoal as a surrogate value for carbonized

materials. *Id.* at 27. Commerce did not rely on the previous reviews and court

cases because they involved a party advocating for the use of wood-based charcoal,

but rather to show that "that coconut shell carbmat shares many similarities with

coal-based carbmat and is an appropriate surrogate for coal-based carbmat."

Appx4800 & n.26.

    For the same reason, the Court should reject Carbon Activated's attempt to

discredit Commerce's reliance on *Albemarle Corp. v. United States*, 27 F. Supp.

3d.1336, 1351 (Ct. Int'l Trade 2014), *aff'd in part, rev'd in part*, 821 F.3d 1345

(Fed. Cir. 2016); *Hebei Foreign Trade & Advertising Corp. v. United States*, 807

F. Supp. 2d 1317, 1319 n.2 (Ct. Int'l Trade 2011); and *Jacobi Carbons AB v.*

*United States*, 443 F. Supp. 3d 1312, 1315 (Ct. Int'l Trade 2020). CA Br. at 28-29;

*see also* Appx4800 & n.25. Again, there is no evidence on the record of this

review indicating that the mandatory respondents used either wood-based

carbonized materials or coconut shell charcoal in the production of activated

carbon exported to the United States. Appx4799-4800. For this reason,

Commerce reasonably exercised its "wide discretion" by considering its prior

reviews, the activation process for activated carbon, and its consistent selection of

32

the more specific subheading category of coconut shell charcoal to value the

mandatory respondents' coal-based carbonized materials. *See Shakeproof*, 268

F.3d at 1381 (recognizing that "{t}he process of constructing foreign market value

for a producer in a non-market economy country is difficult and necessarily

imprecise{,}" and that section 1677b(c) accords Commerce "wide discretion" in

applying statutory guidelines).

Finally, Carbon Activated erroneously asserts that Commerce relied on these

authorities to determine that "coconut-shell charcoal shares more similarities with

coal-based carbmat than wood-based charcoal." CA Br. at 29. Commerce made

no such statement in its remand results. Rather, Commerce explained that it has

demonstrated in previous reviews and before the trial court "that coconut shell

carbmat shares many similarities with coal-based carbmat and is an appropriate

surrogate for coal-based carbmat." Appx4800 & n.26. Commerce also found that

"{t}he limited information on the record regarding the physical characteristics of

wood-based, coconut-shell-based, and coal-based activated carbon does not

indicate that coal-based activated carbon is more alike one or the other type of

carbonized material." Appx4801-4802. In fact, the mandatory respondents

recognized this fact in their draft remand comments when they stated that

"{w}ood-based activated carbon shares iodine number with coal based activated

carbon, but differs in terms of apparent density and water soluble ash." *See*

Appx4912 (explaining several similarities and differences among wood-based, coconut shell-based, and coal-based activated carbon).

Because the record establishes that wood charcoal generally undergoes a chemical activation process that is distinct from the steam or thermal activation of the coal-based carbonized materials used by the mandatory respondents, Commerce reasonably exercised its discretion and expertise in selecting Malaysian imports under HTS 4402.90.1000 (coconut-shell charcoal) to value the respondents coal-based carbonized materials. *See Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1345 (Fed. Cir. 2011) ("Because Commerce's reading of the evidence was reasonable, the court rejects {appellant's} challenge to Commerce's use of HTS 7407.21.10 . . . to calculate the surrogate value of brass bar.").

***

Notwithstanding its general arguments regarding the differences in properties between coconut-shell and wood charcoal (as compared to coal-based carbonized materials), Carbon Activated has not provided any new evidence in this review to warrant a departure from Commerce's practice of selecting coconut-shell charcoal to value the respondents' coal-based carbonized material. Further, aside from mischaracterizing Commerce's reasoning, Carbon Activated has failed to explain why it was unreasonable for the agency to rely on the activation process

34

for activated carbon to find that it was not appropriate to use Malaysian imports under HTS 4402.90 (which includes other wood) to value the coal-based carbonized used to produce steam activated carbon.  Absent new facts with respect to the materials used in the production of subject merchandise, it was reasonable for Commerce to continue to use the same HTS subheading for coconut-shell charcoal to value coal-based carbonized materials, so as to avoid potential distortion arising "from the parties' arguing merely for the most advantageous {surrogate value} and limit{ } the potential for endless cherry picking of datasets based on the mere disagreement in how Commerce exercises its discretion in {surrogate value} selection."  Appx4802; *see Qingdao Sea-Line Trading Co.*, 766 F.3d at 1386.

## III.    Carbon Activated Failed To Exhaust Administrative Remedies Related To Its Wood-Feedstock Argument

Carbon Activated contends that the record evidence indicates that steam activated carbon *can* be made using wood charcoal because the scope of the order expressly references wood as a feedstock for subject merchandise that is 'activat{e}d with heat and steam,' as Commerce itself acknowledged in a prior review."  CA Br. at 25-26 (citing the fourth administrative review IDM &

Appx1016).  Carbon Activated failed to exhaust its administrative remedies

concerning this argument.[3]

Pursuant to 28 U.S.C. § 2637(d), parties are required to exhaust

administrative remedies prior to bringing an action in this Court, except in limited

circumstances not relevant here. *Boomerang Tube, LLC, TMK IP-SCO v. United

States*, 856 F.3d 908, 912-13 (Fed. Cir. 2017).  Further, this Court has recognized

that "Commerce regulations require the presentation of all issues and arguments in

a party's case brief," and this Court "ha{s} held that a party's failure to raise an

argument before Commerce constitutes a failure to exhaust its administrative

remedies." *Qingdao Sea-Line Trading Co.*, 766 F.3d at 1388.  Carbon Activated

did not raise the "wood feedstock" issue in its comments related to the draft

remand redetermination or any other briefing before Commerce.  Appx4908-4927,

Appx4632-4709.  Thus, Commerce has had no opportunity to address this

argument related to the relevance of "wood feedstock" in the scope because it was

not raised during the administrative proceeding.  Because Carbon Activated failed

to exhaust its administrative remedies, it has waived arguments related to the

relevance of the "wood feedstock" language appearing in the scope. *See, e.g.*,

---

[3]  In the trial court, we raised Carbon Activated's failure to exhaust its
administrative remedies related to its wood-feedstock argument.  Appx4881-4882.
The trial court did not reach this issue.

*Qingdao Sea-Line Trading Co.*, 766 F.3d at 1388 ("refus{ing} to consider those arguments not presented in the underlying administrative proceedings").

## **CONCLUSION**

For these reasons, we respectfully request that the Court affirm the judgment of the Court of International Trade.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

OF COUNSEL:

ASHLANDE GELIN
Attorney
Office of the Chief Counsel
    for Trade Enforcement & Compliance
U.S. Department of Commerce

/s/ Antonia R. Soares
ANTONIA R. SOARES
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington D.C. 20044
(202) 305-7405
antonia.soares@usdoj.gov

January 22, 2024

Attorneys for Defendant-Appellee
United States

## <u>CERTIFICATE PURSUANT TO RULE 32(A)(7)(C)</u>

I, Antonia R. Soares, a trial attorney in the Department of Justice, Civil

Division, Commercial Litigation Branch, certify that this brief, which used Times

New Roman font with 14 point type, contains 7,748 (relying upon the Microsoft

Word word count feature of the word processing program used to prepare this

principal brief) and complies with the type-volume limitation contained in Rule

32(a)(7)(B).


       Antonia R. Soares
       Antonia R. Soares

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that, on this 22nd day of January, 2024, a copy of the foregoing BRIEF OF DEFENDANT-APPELLEE UNITED STATES was filed electronically.

__X__ This filing was served electronically to all parties by operation of the Court's electronic filing system.

_____

_____ A copy of this filing was served via:

_____ hand delivery

_____ mail

_____ third-party commercial carrier for delivery within 3 days

_____ electronic means, with the written consent of the party being served

To the following address:

<u>/s/ Antonia R. Soares</u>
Antonia R. Soares